[Cite as *In re Guardianship of Miller*, 187 Ohio App.3d 445, 2010-Ohio-2159.]


# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## LOGAN COUNTY


**IN RE GUARDIANSHIP**
**OF MILLER.**                          **CASE NO.  8-09-20**


**O P I N I O N**


Appeal from Logan County Common Pleas Court
Probate Division
Trial Court No. 07-GI-01

**Judgment Affirmed**

**Date of Decision:   May 17, 2010**


**APPEARANCES:**

Grant A. Wolfe, for appellant, Rosanna Miller.

Steven R. Fansler, for appellee.


**WILLAMOWSKI, Presiding Judge.**

**{¶1}** Petitioner-appellant, Rosanna Miller, brings this appeal from the judgment of the Family Court of Logan County, Probate Division, denying her petition to have her father, Clair R. Miller, found to be incompetent. For the reasons set forth below, the judgment of the trial court is affirmed.

**{¶2}** On January 4, 2007, Rosanna filed a petition to be named the guardian of the person and of the estate of Clair, claiming that Clair was incompetent to care for himself or his estate. Hearings on the petition were held on July 10 and September 14, 2007. Dr. John Tilley, a psychologist, Dr. Winfred Stoltzfus, Clair's family doctor, and Rosanna testified at the first hearing. Howard Traul, the court-appointed guardian ad litem, testified at the second hearing. Prior to the first hearing, the trial court conducted an in camera interview with Clair. Various family members filed numerous documents with the trial court as well.[1] Dr. David J. Tennenbaum, a psychologist, filed his assessment report of Clair on May 29, 2008. On September 2, 2009, the trial court entered its judgment entry finding that Rosanna had not proven by clear and convincing evidence that Clair was incompetent and dismissed the petition. Rosanna appeals from this judgment and raises the following assignments of error.

First Assignment of Error

---

[1] Most of these documents were letters and statements concerning the family history, who dislikes whom, why certain siblings "hated" their mother, why certain siblings should not be believed, and statements about who is trying to "take advantage" of Clair. These documents were filed to inform the trial court of the wishes of the siblings.

[Clair] is mentally impaired due to dementia, is incompetent, as defined in [R.C. 2111.01(D)], and has been incompetent since the death of his wife in November 2006.

### Second Assignment of Error

The probate court abused its discretion by finding that [Rosanna] failed to prove by clear and convincing evidence that [Clair] is and was incompetent and in need of a guardian of both his person and estate.

### Third Assignment of Error

The probate court abused its discretion by failing to appoint [Rosanna] as guardian of both the person and estate of [Clair].

### Fourth Assignment of Error

The report of the guardian ad litem filed on November 21, 2007, was inaccurate, incomplete and not legally sufficient to warrant approval by the probate court.

### Fifth Assignment of Error

The final report/account of the guardian ad litem filed on November 9, 2009, was inaccurate, incomplete and not legally sufficient to warrant approval by the probate court.

{¶3} In her first and second assignments of error, Rosanna alleges that the trial court abused its discretion by finding that Clair was not proven legally incompetent. A person is legally incompetent if he or she "is so mentally impaired as a result of a mental or physical illness or disability * * * that the

person is incapable of taking proper care of the person's self or property * * *."

R.C. 2111.01(D).

> Prior to the appointment of a guardian or limited guardian * * *, the court shall conduct a hearing on the matter of the appointment. The hearing shall be conducted in accordance with all of the following:
>
> (1) The proposed guardian or limited guardian shall appear at the hearing and, if appointed, shall swear under oath that the proposed guardian or limited guardian has made and will continue to make diligent efforts to file a true inventory in accordance with [R.C. 2111.14] and find and report all assets belonging to the estate of the ward and that the proposed guardian or limited guardian faithfully and completely will fulfill the other duties of guardian, including the filing of timely and accurate reports and accountings;
>
> * * *
>
> (2) If the hearing concerns the appointment of a guardian or limited guardian for an alleged incompetent, the burden of proving incompetency shall be by clear and convincing evidence
>
> * * *
>
> (6) The court may deny a guardianship based upon a finding that a less restrictive alternative to guardianship exists.

R.C. 2111.02(C). The trial court is granted broad discretion in matters involving the appointment of a guardian for one alleged to be incompetent. *In re Guardianship of Slone*, 3d Dist. No. 3-04-13, 2004-Ohio-6041. When reviewing the trial court's findings, this court must be guided by the presumption that the findings were correct. Id. "The rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the

witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Id. at ¶ 9. Thus, the judgment supported by competent, credible evidence shall not be reversed as an abuse of discretion. Id.

{¶4} In this case, Rosanna claims that her father is incapable of taking care of either himself or his estate and seeks a full guardianship. The basis for this claim is that he is allegedly suffering from dementia, and his wife, who previously cared for him, has passed away. In support of her claims, Rosanna points to the reports of Dr. Tilley, Dr. Tennenbaum, Traul, and the court investigator, who all concluded that a guardianship may be in Clair's best interests.

{¶5} The testimony of Dr. Tilley was that he believed that Clair was suffering from depression over the loss of his wife and some dementia. This was based upon two hours conversing with Clair and the results of various tests. He recommended granting a full guardianship of Clair's person and estate. However, he also testified on cross-examination as follows.

Q. You haven't seen him since March the 6th.

A. No, I have not.

Q. And so you can't tell us today that your report and your opinions and evaluation and your conclusions you drew therefrom are valid as of today, correct?

A. That's correct.

Q. They're only valid as of March 6th, 2007.

A. No, I wouldn't say that's – that's correct. I understand where you're going with things, which is to say that people can change and individuals of his age and his condition can fluctuate in their mental status and so on and so forth, but to say that the conclusions rendered have to be enacted on the day that the procedures were completed would be stretching it a bit too far.

Q. But you do agree that things can change, don't you?

A. Absolutely.

Q. And they can change for the better.

A. Yes, they can.

Q. Okay. And Mr. Miller could be a whole bunch better today than he was on March 6, 2007.

A. Could be.

Mr. Baggot: Nothing further, Your Honor, thank you.

The Court: * * * Doctor, if – take into account all of the testing parameters that you performed on Clair Miller and your supervisees and the education, years of experience you brought to bear in the analysis of that, and if you add to that the factual issue that you know of of (sic) the passing of – of Mr. Miller's wife of many, many years – I think five plus decades, as I recall in my conversation with him – and if you also assume that there is a – massive amount of familial turmoil and upset among the siblings, levels of distress, finger-pointing, accusations – even as far as –

well, I don't like to say this in front of Clair – the cause of death of his wife.

The Witness:  Uh-huh.

The Court:  Money issues.  When you overlay on that the issues of some of his physical issues relating to sight – I know he's very frustrated by his sight.  Anybody would be frustrated by not being able to see very well.  Taking into account all those factors and what I've added to that, which is some of the social work of the family, does that change at all – do you have an opinion when he asked you that question about the degree of medical certainty?  If you assume all those facts, does that change any of your analysis?

The Witness:  No, I don't think it does.  I was – I attempted to – to address some of those issues, particularly –

The Court:  Okay.

The Witness:  -- the depression and the bereavement and how that may be impacting his situation.  And in my report, I put in a section where I – I discussed the prospect of the possibility of a pseudodementia, which is a condition in which – which is sometimes common amongst elderly in which an individual appears to be demented, by (sic) it's actually the result of a depression and not so much of a pathophysiological process like Alzheimer's disease.

The Court:  Okay.

The Witness:  But in his case, based on a number of factors, it appeared that it wasn't a pseudodementia, but instead was actually a dementia.  Could I be wrong about that?  Absolutely.  There is certainly the prospect that I'm wrong.  And could it really be a lot of this other turmoil that's going on that has caused him to present in a way that's led me to believe that he has dementia, is incompetent?  Absolutely.

> At this point I'm not 100 percent confident that he has dementia, but certainly at the time that I formulated the opinion was at least confident enough to a 51-percent degree of certainty to opine that he was.

{¶6} The next witness presented was Dr. Stoltzfus. Dr. Stoltzfus testified that he administered a mini-assessment of mental status to Clair. Clair scored 27 out of 28 points, which is within the normal range and would not result in a clinical diagnosis of dementia. He testified that he is familiar with the legal standard for findings of incompetence and has testified in several guardianship hearings previously. As to Clair, Dr. Stoltzfus testified that he was oriented to time and place and that Clair was able to physically and mentally attend to his own needs. Although Clair does need some assistance due to his age and problems with his sight, his physical disabilities do not make him incompetent.

{¶7} Rosanna also testified at the hearing. She testified that she was concerned for her father because he seemed to have memory lapses immediately after the death of his wife. She was primarily concerned that her brother, James, seemed to have an undue influence over her father. She testified that her father had previously given her power of attorney, but had attempted to revoke it. However, most of her testimony concerned her concerns that her brother was using her father and how he might steal from her father. Based upon these fears, Rosanna testified that she had removed several assets from her father's home to

protect them. When her father objected to her doing this, she then filed the petition for guardianship so that she could protect her father from James.

**{¶8}** A second hearing was held on September 14, 2007. At this hearing, Traul, in his position as guardian ad litem of Clair, presented his report. He testified as follows.

> Mr. Traul: I have immediately, upon getting the entry from the Court, I sent Mr. Miller a letter asking him to contact my office, to make an appointment to review these matters. He was in my office today. But in the mean time I made several attempts to contact him at his home. I was successful on two occasions. Had a nice visit with him for 15 to 20 minutes on each occasion.
>
> Also visited Max Powell, next door neighbor, and his wife about what they believe to be the living circumstances of Mr. Miller's and his well being.
>
> Ellen Cathey: (Laughing.)
>
> The Court (sic): And I have spoken with Marshal Pierson of Adult Protective Services, as well as with Attorney Bridget Hawkins, and Attorney Baggott.
>
> So having garnered that information during the past week and a half, and reviewed the court file, I believe at this time, your Honor, that I can report that I really do not believe that Mr. Miller needs a guardian of his person.
>
> Ellen Cathey: (Clapping.)
>
> Mr. Traul: I believe he is living as he chooses to live in a modicum of safety and of – at his home where he has been for many years. And he seems to be well adjusted in living there from day to day.

> That is the report that I saw with my own eyes and from visiting with all the people I have talked to.
>
> However, after again talking with these people and investigating the information that I have found, I do have to tell the Court that I believe there is some need for some type of control and restraint upon Mr. Miller with regard to his finances. I think that there are – I think he is enduring unnecessary contact from a variety of people, his family, and perhaps third parties, with regard to his finances.
>
> I believe there ought to be some control on his finances so he can have the peace in which he deserves to enjoy life without the unnecessary and undue influence, or worse, upon his finances. It's very troubling and stressful to him.
>
> I think there ought to be some mechanism in the law to allow for some control over those finances, be it through Adult Protective Services, or be it some general control that the Court itself can exercise.
>
> I think if the Court – my suggestion is that Court take a week or two to find out what legal basis, and I will be happy to give any help to the Court that I can, and with Mr. Miller's counsel, to investigate what the possibilities are, either judicial or extra judicial that may be possible to accommodate this rather unique circumstance and still give Mr. Miller the peace and quiet he deserves with as much control as he needs.

A review of the record indicates that the unique circumstances to which Traul refers is the extreme infighting among Clair's children as they try to establish control over access to their father and his assets.[2]

---

[2] The record indicates, as referenced above, that numerous letters and documents were filed by the children. These filings frequently related to past sibling rivalry dating from childhood on. There were numerous letters addressing who was a favorite of Ann Miller, Clair's deceased wife, and who hated her and why. Other letters addressed alleged alcohol and drug abuse, suicide attempts, marital infidelities, domestic-abuse allegations, the possiible murder of Ann, and other difficulties that were parts of the lives of the five children. Any time one child filed a document, the others then filed a response indicating why

{¶9} Subsequent to the hearings, a second psychological evaluation was ordered. Dr. Tennenbaum conducted this exam on May 16, 2008, in Clair's home. The appointment took court orders to occur without being taped or in the presence of James.[3] Outside of the presence of James, Dr. Tennenbaum found Clair to be pleasant. Clair was upset that he did not have control over his own finances and was not happy with everyone trying to "cheat" him out of the money he earned. Tennenbaum's report indicates that when Clair is calm and his stress level is lower, his memory and cognition improve. The report indicates that Clair gave a new power of attorney to his niece instead of his children because there were problems with all his children. The report further indicates that many of Clair's mental issues are related to the intense stress of his family relations, the guardianship proceedings, and the fighting of the children as they appear to be "vying for his wealth." Dr. Tennebaum finished his report with the following conclusions.

> My initial opinion was that – all of his deficits notwithstanding – a guardianship should not be established. Considered was suggesting establishing a Conservatorship, the hurdle being that Mr. Miller is not likely to agree to the appropriateness of any management of his resources. The issue here, again, is the inconsistent appraisal of his own worth, and his resources.

that child should not be believed. In addition, other family members, including sisters of the decedent, ex-husbands, in-laws, grandchildren, et cetera, were drawn into the conflict by the children. None of these documents had any relation to whether Clair was competent, but rather were blatant attempts to influence the court against another sibling.

[3] By the number of telephone transcriptions and transcriptions of other conversations filed by James, he seems to record all conversations. The daughters merely use their recall to recreate those conversations.

The Court is faced with an unclear dilemma: While it goes beyond the scope of an assessment to attempt quantifying or assigning the extent that the children's greed weighs upon the decision ultimately, despite my time-limited efforts I was unable to gain sufficient data to view this gentleman as consistently capable of appreciating his own worth, being unable too to explain, in the absence of documents that were made available to me, his perception that his son should, as he said, "get it all." Of course, I cannot know to what extent Jim's impact impairs what might otherwise have been a more adequate presentation overall, this elderly gentleman being enmeshed in his son's quest for orchestrating Mr. Miller's remaining years.

There remain several alternatives available to the Court. Possibly guardianship should be limited to the estate; possibly Mr. Miller can appreciate that this may be reversed at some point. His more reasonable individually experienced presentation notwithstanding, at this point there does appear merit for establishing a limited guardianship, to allow oversight of the estate only.

{¶10} On September 2, 2009, the trial court entered judgment finding

Clair to be not incompetent as defined in R.C. 2111.01.

The Court FINDS after due consideration of all testimony, the original *in camera* interview of Mr. Miller, a review of the evidence received and all pleadings, including the consultation and assessment reports, and the expert evaluations of the ward, by the application of the clear and convincing evidence standard, that the ward is NOT incompetent as defined in Chapter 2111 of the Ohio Revised Code.

Notwithstanding this finding, the Court believes it is the duty of the Court to protect the rights of individuals and within the least restrictive alternative possible. Mr. Miller maintains in his own home and has a sufficient income and assets to remain there, at least at this time. While the Court is vitally concerned about the level of acrimony and family discord that exists between the four surviving

children of Mr. Miller, and the challenges he faces daily due to his vision, the Court does believe, it is in the best interest of CLAIR R MILLER, to have a conservatorship filed of his behalf, Ohio Revised Code, 2111.02.1. Obviously a Conservatorship under Ohio law is consensual in nature. Therefore, while the Court would consider the viability and approval of such action, this Court believes it to be inappropriate and not consistent with Ohio law to Order such a filing *sua sponte*.

{¶11} Rosanna argues that this judgment is not supported by the evidence and points to the testimony of Dr. Tinney and the report of Dr. Tennenbaum as evidence to support her claim. However, a review of this evidence indicates that Dr. Tinney testified that he was not sure that Clair suffers from dementia, which would render him incompetent, and that he could certainly be wrong. His testimony is that he is at least 51 per cent sure that Clair is incompetent. This would be sufficient if the standard of proof were preponderance of the evidence, but it is not. Fifty-one per cent does not reach the level of clear and convincing evidence.

{¶12} Dr. Tennenbaum and Traul both presented evidence that while Clair may need help, this need seems to be arising from the pressure from his children. Their constant fighting over who should be in charge of Clair and his money is putting him under tremendous stress, which affects his memory and his ability to handle his own affairs. The evidence from these sources indicates that a limited guardianship of the estate would be appropriate to protect those assets from his

children. The record overwhelmingly supports, and the trial court strongly recommended, the conclusion that a conservatorship would be appropriate to allow Clair's assets to be protected from all of his children, to allow him to live without the constant battles for control by the children, and to allow his assets to be used for his benefit alone. However, neither Dr. Tennenbaum nor Traul indicated that Clair was incapable of handling his own assets if he were not subject to the constant interference and pressure of his children's demands. At no time did either of them testify that Clair was incompetent, just that his "unique circumstances" and family dynamics made managing difficult.

{¶13} Contrary to this evidence was the testimony of Dr. Stoltzfus that Clair was both physically and mentally competent. As his primary physician, Dr. Stoltzfus was able to view any alleged deterioration in Clair. Additionally, the trial court met with Clair personally and questioned him during the in camera interview. Based upon all the evidence before it, the trial court determined that Rosanna had not met her burden of proving by clear and convincing evidence that Clair was incompetent. This court finds that there is competent, credible evidence to support the trial court's decision.

{¶14} In addition, the trial court has the authority to deny the guardianship petition if a less restrictive solution is available. R.C. 2111.02(C)(6). Throughout the proceedings, Rosanna has requested that she be granted guardianship of Clair's

person and estate. In her appellate brief, she again requests that this court appoint her as guardian of Clair's person and estate. There is substantial evidence in the record to indicate that Clair does not need a guardian of his person, only possibly of his estate. Because there are less restrictive alternatives available, the trial court properly denied the petition for guardianship. For these reasons, the first and second assignments of error are overruled.

{¶15} Having found that the trial court's judgment finding Clair to be competent is not an abuse of discretion, the remaining assignments of error become moot. Thus, they need not and will not be addressed.

{¶16} The judgment of the Family Court of Logan County, Probate Division, is affirmed.

Judgment affirmed.

SHAW and PRESTON, J.J., concur.