[Cite as *In re Guardianship of S.H.*, 2013-Ohio-4380.]

COURT OF APPEALS
MEDINA COUNTY, OHIO
NINTH APPELLATE DISTRICT

| | | |
|---|---|---|
| | | JUDGES: |
| IN RE: GUARDIANSHIP OF | : | Hon. W. Scott Gwin, P.J. |
| S.H. | : | Hon. William B. Hoffman, J. |
| | : | Hon. Sheila G. Farmer , J. |
| | : | Sitting by Supreme Court Assignment |
| | : | |
| | : | Case No. 13CA0066-M |
| | : | |
| | : | |
| | : | |
| | : | O P I N I O N |

CHARACTER OF PROCEEDING: Appeal from the Medina County Court of Common Pleas, Probate Division, Case No. 2013 07 GM 00029

JUDGMENT: Reversed and Remanded

DATE OF JUDGMENT ENTRY: October 1, 2013

APPEARANCES:

For- Applicant-Appellant Maria Schimer       For - Proposed Ward

CLAIR E. DICKINSON                           SHORAIN L. MCGHEE
NICHOLAS P. CAPOTOSTO                         4141 Rockside Road, Ste. 230
NICOLE SWEARINGEN-HILKER                      Seven Hills, OH 44131
388 South Main Street, Ste. 500
Akron, OH 44311

Guardian Ad Litem                            For – Parents of Proposed Ward

JENNIFER MATYAC                              JOHN C. OBERHOLTZER
326 N. Court Street                          39 Public Square, Ste. 201
Medina, OH 44256                             Medina, OH 44256

**{¶1}** In *In re Guardianship of S.H.*, 9th Dist. Medina No. 13CA0057-M, 2013-Ohio-3708 ["*S.H.1*"], this Court remanded this case to the probate court to determine whether it would be in S.H.'s best interests to appointment a guardian for purposes of making medical decisions on her behalf. [1] Upon remand the Medina County Court of Common Pleas, Probate Division found that it was not in the best interests of S.H. to appoint Schimer as guardian of S.H. for purposes of making medical decisions on S.H.'s behalf.

**{¶2}** Schimer raises one assignment of error,

**{¶3}** "I. THE TRIAL COURT INCORRECTLY DENIED MARIA SCHIMER'S MOTION FOR IMMEDIATE APPOINTMENT OF A LIMITED GUARDIAN."

I.

**{¶4}** The probate judge based his conclusion upon, among other concerns, on three main areas: (1). The Medina County Jobs and Family Services refused to file a Complaint alleging Dependency, Abuse or Neglect and seeking temporary custody of S.H. pursuant to R.C. 2151.27; (2). The length and intensity of the chemotherapy regime was too invasive and destructive of the family unit; and (3). The proposed guardian has never met S.H. and does not intend to transport, accompany or personally support S.H. as she is undergoing the treatments.

**{¶5}** For the reasons that follow, we find the decision of the probate court is not based upon competent, credible evidence. We further find that the probate court did abuse its discretion in finding that it was not in the best interests of S.H. to appoint Schimer as guardian of S.H. for purposes of making medical decisions on S.H.'s behalf.

---

[1] For a complete statement of the underlying facts, see *S.H. 1.*

*PREFACE*

**{¶6}** A parent's decision to subject his or her child to potentially life-threatening, painful or debilitating medical procedures that could either prolong the child's life or, in contrast, prolong the process of dying is a difficult and personal decision. The decision "must be made on the basis of individual values, informed by medical realities, yet within a framework governed by the law. The role of the courts is confined to determining the framework, delineating the ways in which the government may and may not participate in such decisions." *Cruzan v. Director, Mo. Dept. of Health*, 497 U.S. 261, 303, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) (Brennan, dissenting). [Hereinafter "*Cruzan*"].

*STANDARD OF REVIEW*

**{¶7}** R.C. 2111.02(A) provides that "[w]hen found necessary, the probate court on its own motion or on application by any interested party shall appoint * * * a guardian of the person, the estate, or both, of a minor or incompetent[.]" Regarding the appointment of a guardian, the probate court is required to act in the best interest of the ward. *In re Estate of Bednarczuk,* 80 Ohio App.3d 548, 551, 609 N.E. 2d 1310 (12th Dist. 1992); R.C. 2111.50(C). The probate court's ruling regarding the appointment of a guardian will not be reversed absent an abuse of discretion if it is supported by competent, credible evidence. *In re Guardianship of Miller,* 187 Ohio App.3d 445, 2010–Ohio–2159, 932 N.E.2d 420 (3rd Dist.). *Accord*, *In re Guardianship of Waller,* 192 Ohio App.3d 663, 2011-Ohio-313, 950 N.E.2d 1207(1st Dist.), ¶16; *In re Guardianship of Anderson*, 2nd Dist. Montgomery No. 25367, 2013-Ohio-2012, ¶15; *In re Guardianship of Borland*, 5th Dist. Stark No. 2002CA00410, 2003-Ohio-6870, ¶8.

*ABUSE OF DISCRETION*

**{¶8}** The term "abuse of discretion" has been applied in a somewhat rote manner by the courts without analysis of the true purpose of the appellate court's role in the review of a trial court's discretionary powers. *State v. Firouzmandi,* 5th Dist. Licking App. No.2006-CA-41, 2006-Ohio-5823, ¶ 54.

**{¶9}** As was noted in *Firouzmandi,* an excellent analysis of the misconception surrounding the concept of "abuse of discretion" was set forth by the Arizona Supreme Court sitting en banc:

> The phrase "within the discretion of the trial court" is often used but the reason for that phrase being applied to certain issues is seldom examined. One of the primary reasons an issue is considered discretionary is that its resolution is based on factors which vary from case to case and which involve the balance of conflicting facts and equitable considerations. *Walsh v. Centeio,* 692 F.2d 1239, 1242 (9th Cir.1982). Thus, the phrase "within the discretion of the trial court" does not mean that the court is free to reach any conclusion it wishes. It does mean that where there are opposing equitable or factual considerations, we will not substitute our judgment for that of the trial court.

*State v. Chapple*, 135 Ariz. 281, 296-97, 660 P.2d 1208, 1223-24(1983), *superseded by statute as stated in State v. Benson _P.3d_2013 WL 3929153(Ariz. July 31, 2013).* The Court further explained,

> The term "abuse of discretion" is unfortunate. In ordinary language, "abuse" implies some form of corrupt practice, deceit or impropriety.

Webster's Third New International Dictionary (1976). In this sense, the application of the word to the act of a trial judge who ruled in accordance with all the decided cases on the issue is inappropriate. However, in the legal context, the word "abuse" in the phrase "abuse of discretion" has been given a broader meaning. In the few cases that have attempted an analysis, the ordinary meaning of the word has been considered inappropriate and the phrase as a whole has been interpreted to apply where the reasons given by the court for its action are clearly untenable, legally incorrect, or amount to a denial of justice. *State ex rel. Fletcher v. District Court of Jefferson County,* 213 Iowa 822, 831, 238 N.W. 290, 294 (1931). Similarly, a discretionary act which reaches an end or purpose not justified by, and clearly against, reason and evidence "is an abuse." *Kinnear v. Dennis,* 97 Okl. 206, 207, 223 P. 383, 384 (1924).

The law would be better served if we were to apply a different term, but since most appellate judges suffer from misocainea, we will no doubt continue to use the phrase "abuse of discretion." Therefore, we should keep some operative principles in mind. Something is discretionary because it is based on an assessment of conflicting procedural, factual or equitable considerations which vary from case to case and which can be better determined or resolved by the trial judge, who has a more immediate grasp of all the facts of the case, an opportunity to see the parties, lawyers and witnesses, and who can better assess the impact of what occurs before him. *Walsh v. Centeio,* supra. Where a decision is

made on that basis, it is truly discretionary and we will not substitute our judgment for that of the trial judge; we will not second-guess. Where, however, the facts or inferences from them are not in dispute and where there are few or no conflicting procedural, factual or equitable considerations, the resolution of the question is one of law or logic. Then it is our final responsibility to determine law and policy and it becomes our duty to "look over the shoulder" of the trial judge and, if appropriate, substitute our judgment for his or hers. This process is sometimes, unfortunately, described as a determination that the trial judge has "abused his discretion ..."

*Chapple,* 660 P.2d at 1224 n. 18 (citations omitted). Accord, *State v. Garza*, 192 Ariz. 171, 175-76, 962 P.2d 898, 902(1998); *Firouzmandi,* ¶54-55; *State v. Saunders,* 5th Dist. Licking App. No.2006-CA-00058, 2007-Ohio-1080 at ¶ 27-28.

*RIGHT TO REFUSE UNWANTED MEDICAL TREATMENT*

**{¶10}** The common law doctrine of "informed consent" has been viewed as generally encompassing the right of a competent adult to refuse medical treatment. *Cruzan,* 497 U.S. at 277, 110 S.Ct. 2841, 111 L.Ed.2d 224. "The right to be free from unwanted medical attention is a right to evaluate the potential benefit of treatment and its possible consequences according to one's own values and to make a personal decision whether to subject oneself to the intrusion." *Cruzan,* 497 U.S. 261, 309, 110 S.Ct. 2841, 111 L.Ed.2d 224 (Brennan, dissenting). In *Cruzan,* the Court found the right of a competent adult to refuse unwanted medical treatment to be a constitutionally protected liberty interest under the due process clause of the Fourteenth Amendment.

This constitutionally protected right to refuse unwanted medical treatment has been recognized in Ohio,

> The Supreme Court of Ohio recognizes an Ohioan's fundamental right to refuse medical treatment on the basis that "personal security, bodily integrity, and autonomy are cherished liberties." *Steele [v. Hamilton Cty. Community Mental Health Bd.,* 90 Ohio St.3d 176, 736 N.E.2d 10, 2000-Ohio-47] at 180, 736 N.E.2d 10. "These liberties were not created by statute or case law. Rather, they are rights inherent in every individual." *Id.* at 180-81, 736 N.E.2d 10 (citing Section 1, Article I, Ohio Constitution). The court has further held that "[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body." *Id.* at 181, 736 N.E.2d 10 (quoting *Schloendorff v. Soc. of N.Y. Hosp.* (1914), 211 N.Y. 125, 105 N.E. 92, 93).

*Licking & Knox Community Mental Health & Recovery Bd. v. T.B.*, 10th Dist. Franklin No. 10AP–454, 2010–Ohio–3487, ¶19. A competent person may refuse medical treatment regardless of the fact that there may be severe consequences involved for refusing treatment. *Cruzan*, 497 U.S. 261, 306, 110 S.Ct. 2841, 111 L.Ed.2d 224 (Brennan, dissenting). That the state may disagree with a competent individual's decision to forego medical treatment is of no consequence, "[t]he regulation of constitutionally protected decisions...must be predicated on legitimate state concerns *other than* disagreement with the choice the individual has made...Otherwise the interest in liberty would be a nullity...."(emphasis sic.) *Cruzan*, 497 U.S. 261, 313-314,

110 S.Ct. 2841, 111 L.Ed.2d 224 (Brennan, dissenting) (*quoting* Hodgson *v. Minnesota*, 497 U.S. 417, 435, 110 S.Ct. 2926, 111 L.Ed.2d 344(1990)).

{¶11} Children are entitled to the protection of the Constitution and possess certain constitutional rights. *Bellotti v. Baird*, 443 U.S. 622, 633-634, 99 S.Ct. 3035, 61 L.Ed.2d 797(1979); *In re Gault*, 387 U.S. 1, 13, 87 S.Ct. 1428, 18 L.Ed.2d 527(1967). However, the constitutional rights of minors cannot be equated with those of adults. Three reasons have emerged for the difference in treatment, (1). The peculiar vulnerability of children; (2). Their inability to make critical decisions in an informed, mature manner, and (3). The importance of the parental role in child rearing. *Bellotti*, 443 U.S. at 634, 99 S.Ct. 3035, 61 L.Ed.2d 797.

{¶12} To be sure, the constitutional rights of children are generally exercised by his or her parent. "The common law historically has given recognition to the right of parents, not merely to be notified of their children's actions, but to speak and act on their behalf." *Hodgson v. Minnesota, 497* U.S. 417, 483, 110 S.Ct. 2926, 111 L.Ed.2d 344(1990) (Kennedy, J. concurring in part, dissenting in part).

*PARENTS' RIGHT TO MAKE MEDICAL DECISIONS FOR HIS OR HER CHILD*

{¶13} Since *Meyer v. Nebraska,* 262 U.S. 390, 399, 401–03, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), the United States Supreme Court has recognized the fundamental liberty interest of parents in the custody, care and control of their children.

{¶14} In his dissenting opinion, Justice Katz of the Supreme Court of Connecticut traced the line of Supreme Court cases, beginning with *Meyer,* in which this fundamental liberty interest is recognized,

The Supreme Court's decisions recognizing this fundamental right date back to at least 1923. See *Meyer v. Nebraska,* 262 U.S. 390, 399, 401–03, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (concluding that "proficiency in foreign language ... is not injurious to the health, morals or understanding of the ordinary child" and recognizing right of parents to "establish a home and bring up children" and to "control the education of their own"); *Pierce v. Society of Sisters,* 268 U.S. 510, 534–35, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (holding that state could not interfere with parents' decision to send children to private schools when decision was "not inherently harmful" and recognizing right "to direct the upbringing and education of children under their control"); *Wisconsin v. Yoder,* 406 U.S. 205, 232, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (exempting Amish from state compulsory education law requiring children to attend public school until age eighteen, recognizing that "primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition"); see also *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944) ("[i]t is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder"); *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) ("[i]t is plain that the interest of a parent in the companionship, care, custody, and management of his or her children 'come[s] to this [c]ourt with a momentum for respect lacking when

appeal is made to liberties which derive merely from shifting economic arrangements' "); *Quilloin v. Walcott,* 434 U.S. 246, 255, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978) ("[w]e have recognized on numerous occasions that the relationship between parent and child is constitutionally protected"); *Parham v. J.R.,* 442 U.S. 584, 602, 99 S.Ct. 2493, 61 L.Ed. 2d 101 (1979) ("Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children. Our cases have consistently followed that course"); *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (discussing "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child"); *Washington v. Clucksberg,* 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) ("[i]n a long line of cases, we have held that, in addition to the specific freedoms protected by the [b]ill of [r]ights, the 'liberty' specially protected by the [d]ue [p]rocess [c]lause includes the righ [t] ... to direct the education and upbringing of one's children" [citations omitted] ).

*Fish v. Fish,* 285 Conn. 24, 93 n.3, 939 A.2d 1040(2008 (Katz, J., dissenting).

**{¶15}** There can be no doubt that a parent is required to exercise his or her maturity, expertise and judgment to make medical decisions on behalf of the child,

[A parents duty includes] a "high duty" to recognize symptoms of illness and to seek and follow medical advice. The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's

difficult decisions. More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children. 1 W. Blackstone, Commentaries * 447; 2 J. Kent, Commentaries on American Law * 190.

***

Simply because the decision of a parent is not agreeable to a child or because it involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state. The same characterizations can be made for a tonsillectomy, appendectomy, or other medical procedure. Most children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment. Parents can and must make those judgments.

*Parham v. J.R.*, 442 U.S. 584, 602-603, 99 S.Ct. 2493, 61 L.Ed.2d 101(1979).

The welfare of the child has always been the central concern of laws with regard to minors. The law does not give to children many rights given to adults, and provides, in general, that children can exercise the rights they do have only through and with parental consent. *Parham v. J.R.,* 442 U.S. 584, 621, 99 S.Ct. 2493, 2513, 61 L.Ed.2d 101 (1979) (STEWART, J., concurring in judgment).

*Hodgson v. Minnesota*, 497 U.S. at 482, 110 S.Ct. 2926, 111 L.Ed.2d 344(Scalia, concurring in part, dissenting in part).

{¶16} In the case at bar, both parents and S.H. assert the right to refuse chemotherapy. However, R.C. 2111.50(F) gives the probate court full parens patriae powers,[2] "When considering any question related, and issuing orders for, medical or surgical care or treatment of incompetents or minors subject to guardianship, the probate court has full parens patriae powers unless otherwise provided by a section of the Revised Code." *In re Stein,* 105 Ohio St.3d 30, 2004-Ohio-7114, 821 N.E.2d 1008, ¶85 (O'Conner, J. dissenting); *Accord, In re Guardianship of Constable*, 12th Dist. Clermont No. CA97-11-101, 1998 WL 142381(March 30, 1998); *In re Guardianship of Myers,* 62 Ohio Misc. 2d 763, 610 N.E.2d 663(C.P. 1993). Further, R.C. 2111.50(C) mandates the best interest test be applied in all medical decisions for a ward. *Myers*, 62 Ohio Misc. at 774, 610 N.E.2d 663.

*THE BEST INTEREST OF THE CHILD*

{¶17} In the case at bar, Dr. Prasad Bodas testified that S.H.'s chemotherapy treatment has five separate phases: Induction (five weeks), Consolidation (seven weeks), and Interim maintenance (eight weeks), Delayed Intensification (six weeks) and Maintenance (ninety weeks). The total duration of the therapy is two years, three months.

{¶18} Dr. Bodes further testified there are short-term and long-term effects and appreciable risks from being treated with chemotherapy. The short-term effects include S.H.'s hair falling out, she will suffer fatigue and nausea and she will be at risk for uncontrolled bleeding and developing infections. The long-term concerns are that she

---

[2] "*Parens patriae*" means "parent of his or her country," and refers to "the state in its capacity as provider of protection to those unable to care for themselves," such as children. *Black's Law Dictionary* 1144 (8th ed. 2004). For a brief history of this doctrine see, *Fawzy v. Fawzy*, 199 N.J. 456, 973 A.2d 347, 359, n. 3(N.J. 2009

will become infertile, and she will have a higher risk of developing cardiovascular disease. In addition, the treatment itself may damage her other organs and there is an increased risk of contracting other cancers. S.H. has a small but appreciable risk of dying from the treatment itself. Based upon the record before this Court, it cannot be said that the concerns of S.H. and her parents are entirely unfounded.

**{¶19}** R.C. 2111.02 and 2111.06 vest the probate court with broad power,

Upon a mere finding that it is in the "best interest of a * * * minor," R.C. 2111.02(B) (1) authorizes a probate court to supplant a parent's rights and responsibilities through appointment of a limited guardian. Similarly, R.C. 2111.06 authorizes a probate court to appoint a guardian of a minor not only where the court finds the child's natural parents to be "unsuitable persons" but also upon the mere finding that the child's "interests * * * will be promoted thereby."

*In re Guardianship of Stein*, 105 Ohio St.3d 30, 2004-Ohio-7114, 821 N.E.2d 1008, ¶57. (Moyer, C.J. concurring in part, dissenting in part). However, R.C. 2111.08 recognizes a suitable parent's superior right to the guardianship of his or her children against the rights of a nonparent third party,

The wife and husband are the joint natural guardians of their minor children and are equally charged with their care, nurture, welfare, and education and the care and management of their estates. The wife and husband have equal powers, rights, and duties and neither parent has any right paramount to the right of the other concerning the parental rights and responsibilities for the care of the minor or the right to be the residential

parent and legal custodian of the minor, the control of the services or the earnings of such minor, or any other matter affecting the minor; provided that if either parent, to the exclusion of the other, is maintaining and supporting the child, that parent shall have the paramount right to control the services and earnings of the child. Neither parent shall forcibly take a child from the guardianship of the parent who is the residential parent and legal custodian of the child.

**{¶20}** The Supreme Court of Ohio has recognized the superior guardianship rights and obligations of a child's parents over those of a nonparent,

The major statement by this court on the custody rights of a parent and a nonparent was made in *Clark v. Bayer* (1877), 32 Ohio St. 299, a century ago. In that opinion, Judge Ashburn acknowledges for the court, at page 310, that "in all cases of controverted right to custody, the welfare of the minor is first to be considered," but he also determined that parents who are "suitable" persons have a "paramount" right to the custody of their minor children unless they forfeit that right by contract, abandonment, or by becoming totally unable to care for and support those children.

*Perales v. Nino*, 52 Ohio St. 89. 97, 369 N.E.2d 1047(1977). Although *Perales* concerned a custody petition under R.C. 2115.23(A)(2), the holding has been extended to guardianship proceedings. *In re Guardianship of Wright,* 3rd Dist. Defiance No. 4-01-20, 2002-Ohio-404, citing *In re Jewell*, 4th Dist. Athens No. 1190, 1984 WL 5681(Dec. 6, 1984).

{¶21} Accordingly, although R.C. 2111.02 does not explicitly require a finding of "parental unsuitability" it remains a factor for the court to consider.[3] If the probate court finds that a parent is unsuitable, it clearly would not be in the "best interest" of the minor child to allow the parent to make medical decisions on behalf of the child. However, a finding of parental "suitability" does not end a probate court's inquiry. Parental rights, even if based upon firm belief and honest convictions can be limited in order to protect the "best interests" of the child. "[W]here parental involvement threatens to harm the child, the parents authority must yield." *Hodgson v. Minnesota*, 497 U.S. 417, 471, 110 S.Ct. 2926, 111 L.Ed.2d 344(1990) (Marshall, J. concurring, in part, dissenting, in part) (citing *Prince v. Massachusetts,* 321 U.S. at 169-170; *H.L. v. Masterson,* 450 U.S. at 449(Marshall, J. dissenting)).

{¶22} It is beyond dispute that the *state* may regulate certain areas that touch upon areas of traditional family concern,

> Acting to guard the general interest in youth's well being, the state as parens patriae may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor, and in many other ways. Its authority is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience. (Footnotes omitted).

*Prince v. Massachusetts,* 321 U.S. at 166, 64 S.Ct. 438, 88 L.Ed. 645. When the state seeks to regulate parental decision making against the wishes of the parents, the competing interests "must be determined by balancing [the] liberty interests [of the

---

[3] We modify our previous statement that the best interest of the child be determined "without regard to the suitability of the parents," accordingly. *S.H. 1,* ¶42.

parents and child] against the relevant state interest." *Cruzan v. v. Director, Mo. Dept. of Health,* 497 U.S. at 279, 110 S.Ct. 2841, 111 L.Ed.2d 224(quoting *Youngberg v. Romeo*, 457 U.S. 307, 321, 102 S.Ct. 2452, 2461, 73 L.Ed.2d 28(1982)).

{¶23} In *Prince v. Massachusetts,* the United States Supreme Court recognized the importance of children to the future of our nation is a legitimate state concern that may override parents' wishes,

> A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens, with all that implies. It may secure this against impeding restraints and dangers, within a broad range of selection. Among evils most appropriate for such action are the crippling effects of child employment, more especially in public places, and the possible harms arising from other activities subject to all the diverse influences of the street. It is too late now to doubt that legislation appropriately designed to reach such evils is within the state's police power, whether against the parents claim to control of the child or one that religious scruples dictate contrary action. (Footnotes omitted).

321 U.S. at 168, 169, 64 S.Ct. 438, 88 L.Ed.2d 645. Indeed,

> [O]ur courts have overridden the desires of parents who refused to consent to medical treatment and ordered such treatment to save a child's life. *See Parham v. J.R.,* 442 *U.S.* 584, 603, 99 *S.Ct.* 2493, 2504, 61 *L.Ed.*2d 101, 119 (1979) ("Nonetheless, we have recognized that a state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized." (Citations

omitted)); *Prince, supra,* 321 *U.S.* at 166–67, 64 *S.Ct.* at 442, 88 *L.Ed.* at 652–53 (noting that state, as *parens patriae,* can intrude on parental autonomy to protect child from ill health or death); *Jehovah's Witnesses v. King County Hosp. Unit No. 1,* 278 *F.Supp.* 488, 498–99, 504–05 (W.D.Wash.1967) (holding Washington State statute that declared children to be dependents of state for purpose of authorizing blood transfusions against expressed wishes of parents was constitutional), *aff'd,* 390 *U.S.* 598, 88 *S.Ct.* 1260, 20 *L.Ed.*2d 158 (1968) (per curiam); *State v. Perricone,* 37 *N.J.* 463, 474, 181 *A.* 2d 751 (finding state may act under its *parens patriae* authority to protect child's welfare by declaring him or her neglected to obtain necessary medical treatment), *cert. denied,* 371 *U.S.* 890, 83 *S.Ct.* 189, 9 *L.Ed.*2d 124 (1962); *Muhlenberg Hosp. v. Patterson,* 128 *N.J.Super.* 498, 503, 320 *A.*2d 518 (Law Div.1974) (ordering blood transfusion to infant over parents' wishes). [*Fawzy v. Fawzy,* 199 *N.J.* 456, 474, 973 *A.*2d 347 (2009) (quoting *Moriarty, supra,* 177 *N.J.* at 102–03, 827 *A.*2d 203); *see also Hojnowski v. Vans Skate Park,* 187 *N.J.* 323, 901 *A.*2d 381 (2006) (invoking *parens patriae* doctrine to invalidate exculpatory waiver executed by parent on behalf of minor child).]

"Indeed, the state has an obligation, under the *parens patriae* doctrine, to intervene where it is necessary to prevent harm to a child." *Fawzy, supra,* 199 *N.J.* at 474–75, 973 *A.*2d 347 (footnote omitted) (citations omitted).

*In re D.C. and D.C.,* 203 N.J. 545, 569 4 A.3d 1004 1018(NJ 2010).

**{¶24}** The courts of Ohio recognize the state obligation to intervene to protect its children,

> The state's authority over children's activities must, as we have already noted, be broader than it is over like activities of adults if those of tender years are to be protected against some clear and present danger. Adults are ordinarily free to make choices denied to those of less than full age, but when those choices threaten the welfare of a child, the state must intervene.

*In re Willmann*, 24 Ohio App.3d 191, 199, 493 N.E.2d 1380(1st Dist. 1986),

**{¶25}** Thus, we find that it is well established in Ohio and in other jurisdictions, that, when parents cannot or will not consent to potentially life-saving treatment for a minor, then a court may appoint another to approve the procedure and thereby protect the child's life and health.

**{¶26}** In the case at bar, we note that Schimer has made the application for guardianship,

> Because I believe that [S.H.] needs someone to speak for her and to assist her to have the best chance for survival and to live a long and full and happy life.

1T., July 26, 2012 at 76.

**{¶27}** Schimer's qualifications include her background as a R.N. Schimer is also an Assistant Attorney General for the State of Ohio; a former associate and assist dean of the College of Medicine; and a teacher at Kent State University. Schimer has been

appointed as Guardian in the past, most notable in the 1990's. During that time, Schimer was appointed to assist the Courts in the withdrawal of life-sustaining treatment from older adults who had no Durable Power of Attorney for Health Care decisions and who were unable to speak for his or her self and had no one to speak for them. (1T., July 26, 2012 at 31-32). She was then asked by the Courts to review the cases of several medically compromised, developmentally disabled adolescents, who were unable to speak for themselves and had no family members to speak for them. (Id. at 32-33). Schimer currently has wards in the courts of Summit, Portage and Medina counties. (Id. at 33).

{¶28} Upon being granted access to S.H.'s records and doctors, Schimer consulted with Dr. Bodas, S.H.'s primary oncologist. Dr. Bodas described the prognosis and treatment of S.H. giving her a 85 - 90% survival rate if she receives treatment in accordance with the National Cancer Institute protocol. (Id. at 36 -37).

{¶29} Schimer also met with Dr. Jeffrey Hord, Director of Hematology-Oncology at Akron's Children's Hospital. (1T., July 26, 2012 at 42). Dr. Hoard is also a member of the hospital's Tumor Board, a group of approximately 45 professionals, including physicians, surgeons, nurses, social workers, palliative care personnel who review each and every case of cancer that comes through Akron Children's Hospital for treatment. (Id. at 42).

{¶30} Schimer also met with Dr. Sara Friebert, Palliative Care Director at Akron Children's Hospital. (1T., July 26, 2012 at 43). Palliative care is "a form of medical therapy that provides pain and symptom control for patients who are undergoing any form of care who might be at the end of life." (Id.).

**{¶31}** Finally, Schimer reviewed S.H.'s financial situation and assured the court that S.H. and her family owe nothing and will owe nothing for her medical treatment because it is paid for through government programs. (1T., July 26, 2012 at 44-45).

**{¶32}** Schimer expressed a desire to meet with and work with S.H. and her parents,

> I do believe they're reasonable people. I think people at the hospital are used to dealing with these kind of issues and would assist us in working out a mechanism that would be acceptable to the parents.

> * * *

> And my approach to life is not to hit people head-on. It's to try to work with families, to come to a good place with them so that we can begin to develop some trust so that they can begin to collaborate and approach this in a way that isn't frightening for [S.H.], isn't hostile for [S.H.]

(1T., July 26, 2012 at 60; 74).

**{¶33}** Schimer also testified that the nausea S.H. experienced was ameliorated while S.H. was in the hospital, but things broke down when she went home,

> No. Because she had already had symptoms and waited too long to call, and suffered for a period of time before she was treated.

(1T., July 26, 2012 at 85). Further, the cancer itself can cause symptoms of fatigue and incapacitation. (Id. at 87).

**{¶34}** The probate court's own investigator Nicki Shook spoke with [A.L.] the individual who was providing natural health alternative treatment to S.H. She indicated that she is under a "fellowship program with Dr. [P.L.T.]" whose products are offered on

his web site. Some of the products are FDA approved. All contain warnings and disclaimers. When the Investigator attempted to speak with the doctor, the receptionist stated that [A.L.] "was only a customer of ours." In relationship to the long-term effects regarding S.H.'s health, [A.L.] stated "we just don't know the outcome."

{¶35} The Investigator found S.H. is not in remission and her disease will remain active. S.H. will die without treatment.

{¶36} Both the Investigator and S.H.'s Guardian ad litem suggest the family obtain a second opinion if that will allay the families concerns. Both indicate that no one has presented any evidence, studies or statistics that support a finding that the natural alternative treatment is as effective as chemotherapy. Both the Investigator and the Guardian support continuing S.H.'s treatment.

{¶37} In the case at bar, the medical evidence presented is that the proposed treatment will give S.H. a chance to grow and to thrive. While we respect the wishes of the parents and believe them to be honest and sincere, we are unwilling to adhere to the wishes of the parents under the facts of this case. Both the child's Guardian ad litem and the probate court's own Investigator found it to be in the best interest of S.H. to undergo treatment aimed at saving and preserving her life. The trial court in this case has disregarded those individuals choosing instead to base its decision, at least in part, on matters that are not contained in the trial court record. Further, the trial court's decision is wrought with speculation. The parties have never raised whether R.C. 2116.06 is constitutional as applied.

CONCLUSION

**{¶38}** A parent who has demonstrated sufficient commitment to his or her child is entitled to raise the child free from undue interference from third parties. Cf. *Hodgson v. Minnesota,* 497 U.S. at 447, 110 S.Ct. 2926, 111 L.Ed.2d 344. While we have no doubt that, the parents are acting in accordance with their principles, beliefs and honest convictions and that their goal may be a laudable one, it does not nullify or supersede the right of the state and the probate court to protect the health and well-being of a child.

**{¶39}** We find the decision of the Medina County Court of Common Pleas, Probate Division is not based upon competent credible evidence and is therefore an abuse of discretion.

{¶40} The judgment of the Court of Common Pleas, Probate Division, Medina County, Ohio, is reversed. Section 3(B) (2), Article IV of the Ohio Constitution gives an appellate court the power to affirm, reverse, or modify the judgment of an inferior court. Accordingly, we order the Medina County Probate Court to appoint Schimer as guardian of S.H. for purposes of making medical decisions on S.H.'s behalf without further delay and remand this case to the plenary authority of the Medina County Probate Court for proceedings in accordance with our opinion and the law.

*Gwin, P.J.*

By Gwin, P.J.,

Hoffman, J., and

Farmer, J., concur

_____

HON. W. SCOTT GWIN

_____

HON. WILLIAM B. HOFFMAN

_____

HON. SHEILA G. FARMER

Sitting by Supreme Court Assignment

WSG:clw 0930

[Cite as *In re Guardianship of S.H.*, 2013-Ohio-4380.]

IN THE COURT OF APPEALS FOR MEDINA COUNTY, OHIO

NINTH APPELLATE DISTRICT

IN RE: GUARDIANSHIP OF
S. H.

                :

                :        JUDGMENT ENTRY

                :        CASE NO. 13CA0066-M

For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas, Probate Division, Medina County, Ohio, is reversed. Pursuant to Section 3(B) (2), Article IV of the Ohio Constitution we order the Medina County Probate Court to appoint Schimer as guardian of S.H. for purposes of making medical decisions on S.H.'s behalf without further delay and remand this case to the plenary authority of the Medina County Probate Court for proceedings in accordance with our opinion and the law.

It is ordered that a facsimile copy of this Opinion shall serve as the original.

_____
HON. W. SCOTT GWIN

_____
HON. WILLIAM B. HOFFMAN

_____
HON. SHEILA G. FARMER

Sitting by Supreme Court Assignment