[Cite as *In re I.S.*, 2022-Ohio-3923.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE I.S.                                    :

A Minor Child                                 :                    No. 111508

[Appeal by A.S., Mother]                      :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, VACATED
IN PART AND REMANDED
**RELEASED AND JOURNALIZED:** November 3, 2022

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD22900416

---

***Appearances:***

Scott J. Friedman, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Joseph C. Young, Assistant Prosecuting
Attorney, *for appellee.*

EILEEN A. GALLAGHER, P.J.:

{¶ 1} Appellant-mother A.S. ("Mother") appeals the judgment of the Cuyahoga County Court of Common Pleas, Juvenile Division (the "juvenile court"), that (1) adjudicated her minor child I.S. to be a neglected child, (2) placed I.S. under the protective supervision of the appellee, the Cuyahoga County Division of Children

and Family Services ("CCDCFS" or "the agency") and (3) ordered Mother to obtain medical treatment for I.S. that is contrary to Mother's religious beliefs.

{¶ 2} Mother follows the teachings of Elijah Muhammad and says her religious beliefs forbid surgery or "put[ting] any foreign objects in your body." Based on the recommendation of I.S.'s doctors, the juvenile court ordered Mother to schedule I.S. for a surgical procedure to correct a patent ductus arteriosus (a congenital heart condition) ("PDA"). Mother contends that the adjudication of neglect and the juvenile court's dispositional order violate her rights to freely practice her religion and direct the upbringing of her own child. She argues that the juvenile court overstepped because I.S.'s condition is not immediately life threatening. She contends that no intervention is presently necessary and that she should be allowed to continue monitoring the condition.

{¶ 3} For the reasons that follow, we affirm the juvenile court's adjudication of neglect and we affirm in part and vacate in part its dispositional order.

## I. Factual Background and Procedural History

{¶ 4} I.S. was born on December 16, 2019.

{¶ 5} On January 11, 2022, CCDCFS filed a complaint for neglect and temporary custody along with a motion seeking predispositional temporary custody and authority to consent to any medical treatment necessary to address I.S.'s medical conditions. The complaint alleged that (1) I.S. has life-threatening medical needs that Mother has failed to appropriately address; (2) Mother has not been consistent with necessary medical care for I.S., resulting in further harm to I.S. and

(3) Mother has been offered numerous options by medical staff to assist her in addressing I.S.'s medical needs, but Mother repeatedly rejected these medical recommendations.

{¶ 6} The complaint further alleged that the agency made reasonable efforts to prevent the removal of I.S. from the home and removal from the home was in I.S.'s best interest.[1]

{¶ 7} The agency supported its motion for predispositional temporary custody with an affidavit from CCDCFS social worker Chasidy Balfour. In the affidavit, Balfour attested to the allegations in the complaint. She further described that I.S.'s medical issues could result in death if left untreated and that Mother had been referred to numerous specialists for testing but had not followed through on those referrals. Balfour averred that that the agency's reasonable efforts to prevent removal included a "referral for community-based services."

{¶ 8} The magistrate held a telephonic arraignment and emergency-custody hearing on January 28, 2022. At this hearing, counsel for the agency and Mother reported that they had discussed the matter and jointly recommended holding the motion for temporary custody in abeyance in favor of "some specific orders * * * short of removal." Agency counsel indicated that "we don't want to unduly traumatize the child and cause a removal in a placement if it's really not necessary." As it relates to the agency's concern about I.S.'s PDA, counsel reported that Mother

---

[1] As for I.S.'s father, the complaint alleged that Mother refused to provide the identity of the biological father and the alleged father had failed to establish paternity and had failed to visit, support or communicate with I.S. since I.S.'s birth.

had sought a second opinion on whether surgery was needed. I.S.'s guardian ad litem noted that it "does not appear that the need for heart surgery * * * is needed imminently." Agency counsel indicated that the agency may pursue temporary custody "down the road [if we] feel like the surgery or the repair of the heart is needed and not forthcoming * * *." As it relates to the non-PDA medical concerns the agency had, Mother's counsel indicated that Mother had made appointments for I.S. to undergo two tests the agency sought. The agency requested several specific orders requiring Mother to complete these tests, as well as one further test related to the non-PDA medical concerns, and to sign any necessary releases to allow the agency to help facilitate the appointments.

{¶ 9} The magistrate journalized an entry setting forth the agency's requested orders on the same day as the hearing.

{¶ 10} On March 15, 2022, the magistrate held a pretrial conference. Counsel did not provide any update regarding the concern about I.S.'s PDA. As to the non-PDA medical concerns, agency counsel reported that I.S. had undergone two of the ordered tests but had not completed the necessary follow-up to one of the tests. Counsel further reported that Mother had taken I.S. for the final ordered test but the test could not be completed (through no fault of Mother). Agency counsel requested that the juvenile court continue to hold in abeyance its motion for temporary custody and authority to consent to medical procedures.

{¶ 11} On April 5, 2022, the agency amended the complaint to change its dispositional request to protective supervision (as opposed to its original request for temporary custody).

## A. The Adjudicatory Hearing on the Complaint

{¶ 12} The adjudicatory hearing proceeded on April 6, 2022. The agency presented two witnesses, Dr. Eva Kubiczek-Love and agency social service worker Chasidy Balfour.

### 1. Dr. Eva Kubiczek-Love, I.S.'s Pediatrician

{¶ 13} Dr. Eva Kubiczek-Love testified that she is a pediatric physician with the Cleveland Clinic and sees pediatric patients in an outpatient medical setting. She said she has worked in pediatric medicine for 20 years, having worked ten years in a pediatric emergency room and ten years at the Cleveland Clinic after her medical residency.

{¶ 14} Dr. Kubiczek-Love testified that she was assigned as I.S.'s primary care physician shortly after his birth. She said that I.S. has Down syndrome, Trisomy 21 and a congenital heart defect called a patent ductus arteriosus. In describing what a PDA is, the doctor said that a fetus normally has a channel between two vessels coming off the heart to bypass the lungs in utero. She said this channel typically closes when a baby takes its first breath after birth, but I.S.'s channel remained open.

{¶ 15} Dr. Kubiczek-Love testified that medical staff discovered I.S.'s PDA shortly after his birth and before he left the hospital. She said that I.S. underwent

an echocardiogram at some point and the test showed that I.S. had "a moderate sized PDA with what's called left to right shunt." She related that this means there was blood flowing from left to right. She said that the cardiology team's initial recommendation was for I.S. to undergo a repeat ultrasound but Mother did not allow I.S. to undergo a second test. Dr. Love said she was concerned that Mother seemed "very reluctant to want to pursue that any further as far as looking into how it was progressing and what options were available for closure if it needed to be closed."

{¶ 16} The doctor testified that the PDA was one of several medical concerns she had with respect to I.S. Specifically, Dr. Kubiczek-Love recommended (1) repeat lab work to check for thyroid issues because children with Down syndrome are at a higher risk for those problems and (2) that I.S. follow up with an otolaryngologist because he was snoring a lot and had significant upper-airway noise, which is also commonly seen in children with Trisomy 21.

{¶ 17} Dr. Kubiczek-Love testified that over time she also became concerned that I.S. was not thriving and had some ongoing weight loss. She said she found it difficult to impress upon Mother her concern that "the multifactorial issues" of his ear, nose, and throat issues, his cardiac issues and his thyroid issues had not been addressed. She said all of these issues could be contributing to I.S.'s failure to thrive.

{¶ 18} The doctor said her recommendations to Mother included following up with an otolaryngologist to monitor the upper-airway issues, consulting with a

cardiologist on the PDA, attending appointments with a nutritionist and obtaining a renal–bladder ultrasound.

{¶ 19} Dr. Kubiczek-Love identified a letter that she wrote — dated September 29, 2021 — documenting her medical concerns. She wrote that I.S. is 21 months old and has an established diagnosis of Trisomy 21 with "several active issues," including nutritional issues, a patent ductus arteriosus, obstructive sleep apnea, a history of hydronephrosis and hypothyroidism. She wrote that I.S. continues to have "profound weight loss/decline" which is likely secondary to these several medical problems.

{¶ 20} Of I.S.'s alleged nutritional issues, Dr. Kubiczek-Love wrote that she has "become increasingly more concerned for [I.S.'s] weight." She wrote that I.S.'s growth chart — which has been adjusted for his Trisomy 21 — "clearly demonstrates significant failure to thrive/FTT which means that [I.S.] does not have the ability to combat the myriad of medical issues that are currently being left untreated and severe FTT can result in death." She wrote that Mother had not followed up on a referral she made for Mother with a nutritionist.

{¶ 21} Dr. Kubiczek-Love also wrote that I.S. has a "moderate sized PDA" and that the cardiology team had discussed with Mother that leaving this condition unrepaired "may result in both ongoing inability to thrive (again as evidenced by his growth chart) but may also result in death."

{¶ 22} Dr. Kubiczek-Love wrote that I.S. has "likely significant obstructive sleep apnea/OSA which translates to him likely having low oxygen levels while

sleeping and may result in cardiac strain if not addressed." She wrote that this condition may be contributing to I.S.'s failure to thrive and Mother "has not followed through on the recommendations * * * to have a sleep study to evaluate the degree of severity of his OSA nor to follow up with ENT." She wrote that Mother had previously noted cessation of breathing, which is "unhealthy for [I.S.'s] brain but can be fatal," although Mother apparently reported that this symptom had stopped. Dr. Love noted that I.S. has "ongoing rhonchorous breathing."

{¶ 23} Dr. Kubiczek-Love wrote that I.S. has a history of hydronephrosis (dilated kidney) but that Mother had not pursued a repeat renal–bladder ultrasound and "worsening of his kidney condition can result i[n] deleterious medical consequences with hypertension and renal complications."

{¶ 24} She also wrote that Mother has "not engaged with Endocrinology nor has she had repeat thyroid levels done." She wrote that "left untreated, hypothyroidism may result in irreversible developmental delays, inability to thrive and death."

{¶ 25} In her hearing testimony, Dr. Kubiczek-Love confirmed that there will be a risk of death from hypothyroidism and from the PDA if those conditions were left untreated over time. She also confirmed that if any renal issues are not addressed, I.S. could develop high blood pressure and renal complications. In addition, she testified that, according to the electronic medical records, Mother did not attend any appointments with a nutritionist. She said Mother did attend one

appointment with an otolaryngologist before September 29. She said Mother had not obtained the renal–bladder ultrasound at that time.

{¶ 26} Dr. Kubiczek-Love testified that her recommendation for treating a PDA would generally be to follow the cardiology team's recommendation. She said that while the recommendation is dependent on the size of the PDA, she is certain that at some point in I.S.'s life, his PDA would have to be addressed. She said her particular concern regarding I.S. was that if the PDA was contributing to the failure to thrive, it should be closed "sooner rather than later."

{¶ 27} Dr. Kubiczek-Love further testified that if the PDA were not addressed in a timely manner, I.S.'s heart could become infected. She said that the PDA would also put extra work on I.S.'s lungs, which could lead to chronic lung disease. This latter concern was compounded by I.S.'s upper-airway issues, which were also leading to "more back pressure" on I.S.'s lungs. She described that this added work requires more calories, which may have been why I.S. was not growing sufficiently. "And if you can't grow, if you can't gain weight, you cannot — your body cannot handle these things," she said; "[t]hey just simply eventually will give up."

{¶ 28} She said the risk of chronic lung disease would never go away as long as the PDA remains open. She said she consulted with the cardiology and otolaryngology teams about I.S. and "there was an unequivocal agreement from his medical care team that this was of grave concern." On cross-examination, Dr. Kubiczek-Love admitted that she was not a pediatric cardiologist. She said she "just took what their concerns were and, you know, interwove it as a part of his medical

care team." She said that she took the cardiology team's recommendation and concerns and put them "in the context of everything that was going on with him at the time." She said that she spent a great deal of time speaking with every member of I.S.'s care team to "help make sure that I wasn't miscommunicating my concerns, that I wasn't over dramatizing in the context of all of his medical issues."

{¶ 29} The doctor said that the procedure to close a PDA is typically performed as soon as possible once the child has gained enough weight to undergo the procedure which "is certainly even less than one year of life." She said that once the PDA is closed, "it's fixed, it doesn't come back."

{¶ 30} Dr. Kubiczek-Love testified that there were two ways to close a PDA, both surgical. She described that the first way, catheterization, involves threading a catheter through a small incision in the groin to the PDA and placing a coil into the PDA to seal it. Specifically, she described the procedure as follows:

> [T]hey open the vessel in the groin, and then they sort of push through a catheter, and the catheter contains the coil, and then they lead it to the PDA, place the coil and pull the line.

{¶ 31} The doctor also testified that, while every child is different, children with Trisomy 21 typically handle this procedure well. Medical staff would normally observe the child overnight after the procedure "simply because of the complexity of their upper airway issues."

{¶ 32} On cross-examination, the doctor could not say what complications could occur through the catheterization procedure.

{¶ 33} The doctor described that the second way to close the PDA would be by cutting open the chest wall and addressing the PDA through the chest. The doctor said she did not know specifically how the surgeons would close the PDA, but she said it would "probably be what's called a ligation, which is when they literally tie it shut."

{¶ 34} Dr. Kubiczek-Love said that, as it relates to I.S., she would recommend to close the PDA "as long as the upper airway issue is stable and he is safe to sedate."

{¶ 35} On cross-examination, Dr. Kubiczek-Love admitted that, while I.S.'s PDA was life-threatening, it could be monitored over the course of time. She said that there might be medication and continued testing while the PDA is being monitored. She admitted that if the PDA is being monitored, any increase in the threat or any deterioration of the condition would be noted.

{¶ 36} The doctor further admitted on cross-examination that she did not know how frequently PDAs close spontaneously — that is to say, without medical intervention — after two years of life. But she said she had never heard of a PDA closing spontaneously in an older child.

{¶ 37} Dr. Kubiczek-Love further admitted on cross-examination that I.S. is not currently treating with her and she had not seen him for a year. She said I.S. was scheduled to see her for his 16-month wellness checkup but Mother did not bring I.S. in for the appointment. The doctor admitted that she could only testify about I.S.'s condition as she knew it while she was treating him.

## 2. Chasidy Balfour, Agency Social Service Worker

{¶ 38} Chasidy Balfour testified that she is a social service worker with CCDCFS. She said she received a referral around April 2021 concerning medical neglect of I.S.

{¶ 39} Balfour said she reviewed I.S.'s medical records, visited Mother and spoke to her about the agency's concerns. She said that at the time of the referral, I.S.'s medical team's concerns were that all the issues Dr. Kubiczek-Love described could be life threatening for I.S. She said that one of the agency's primary recommendations was that Mother follow the recommendation for closing I.S.'s PDA. Balfour said that it took some time to get appointments with the specialists that needed to be consulted. For example, they were not able to get an appointment with a cardiologist until around September 2021.

{¶ 40} Balfour said that the Cleveland Clinic cardiology team had several meetings about I.S., some of which she was able to attend. She testified that the agency obtained an opinion around September 2021 that I.S.'s doctors recommended closing the PDA. On cross-examination, she specified the cardiology team had a conference regarding whether they still wanted I.S. to have the surgery and the team reported to the agency that they still recommend the procedure.

{¶ 41} Balfour testified that between September and late November 2021, she discussed with Mother the agency's opinion that — based on the doctors' recommendations — I.S. needed to have the surgery to fix his PDA. She said Mother was uncomfortable with the procedure because of her religion.

{¶ 42} On cross-examination, Balfour admitted that Mother obtained a second opinion at University Hospitals at some point regarding the PDA.

{¶ 43} On cross-examination, Balfour also admitted that Mother had taken I.S. to an otolaryngologist and, she thought, to a urologist. She further admitted that I.S. had gone for a sleep study but the test could not be performed because I.S. was congested at the time.

{¶ 44} On cross-examination, Balfour admitted that Mother seemed sincere in her religious beliefs. On redirect, Balfour identified written excerpts Mother had provided the agency to support her objections to the PDA procedure. Mother wrote that these excerpts were from various books written by Elijah Muhammad, including *How to Eat to Live, Book 2* and *Our Saviour Has Arrived*. The excerpts relate, among other things, that "[T]here is no cure in drugs and medicine," that "[o]ur enemies have resorted to drugs to prolong life due to the fact that they do not want to accept the right way of God to prolong life over their commercial desire" and that "[t]hey have been building up their arm and Arsenal and factories for this day in order to kill the black man[;] [t]hey are doing this in so many ways with drugs and with surgeon's knife in the hospitals."

{¶ 45} Balfour testified that the agency filed the complaint in this matter because it felt I.S. needed to undergo the procedure to close his PDA and Mother refused to obtain the procedure for I.S.

{¶ 46} On cross-examination, Balfour admitted that both Mother's home, and Mother, are appropriate for, and with, I.S. Balfour further admitted that I.S.'s

basic needs are being met and there are no immediate safety threats in the home. She said that she assumes that I.S. is meeting his milestones; he does not talk when she is there, but he walks and plays. She testified that at her last visit with I.S. in April 2022, I.S. was walking and playing with a ball.

{¶ 47} The court admitted two agency exhibits, Dr. Kubiczek-Love's September 29, 2021 letter and the written religious excerpts Mother had sent the agency, without objection from Mother.

### 3. Mother's Case

{¶ 48} Mother did not offer any witnesses or evidence at the adjudicatory hearing.[2]

### B. The Magistrate's Finding of Neglect

{¶ 49} The magistrate issued findings of fact on April 7, 2022. The magistrate found that the allegations in the complaint had been proven by clear and convincing evidence and that "a danger to the child exists." The magistrate adjudicated I.S. to be a neglected child.

---

[2] Mother moved to admit two exhibits and to continue the hearing to call another agency employee. The magistrate denied those requests. Mother does not challenge those rulings on appeal.

**C. The Dispositional Hearing on the Complaint**

{¶ 50} The dispositional hearing commenced on April 8, 2022.[3]  The parties stipulated to the court's incorporation of the evidence from the adjudicatory hearing.

### 1. The Agency's Case

{¶ 51} The agency presented one witness, agency social service worker Jennifer Wagner.

{¶ 52} Wagner testified that she is a social service worker with CCDCFS and has been assigned to I.S.'s case since January 2022.[4]  She said that she has met with Mother, seen I.S. and spoken with medical providers and social workers since being assigned to I.S.'s case.

{¶ 53} Wagner testified that it is her understanding that I.S. is two years old and needs a procedure to close a PDA.  She said that she has separately spoken with medical professionals and Mother about the procedure.  She said she has offered to attend meetings with Mother and medical professionals together, but Mother declined the offer.

{¶ 54} Wagner testified that she has completed two visits to Mother's home. She described the home as "a nice furnished home."  She testified that Mother or

---

[3] At the start of this hearing, Mother's counsel reported that Mother wanted a new attorney because Mother felt her counsel was ineffective.  The agency objected to Mother's motion for a new attorney, and the magistrate denied the motion.  Mother does not challenge that decision on appeal.

[4] Wagner said she was also briefly assigned to the case in 2021.

another one of Mother's children is usually holding I.S. during the visits and I.S. "[s]eems to be a happy, comfortable little boy in her arms." On cross-examination, Wagner described that during one visit I.S. seemed "like a normal two year old."

{¶ 55} Wagner testified that during the initial visit, she discussed with Mother that she could get her some resources, support her and go to medical appointments with her. She also discussed with Mother that it was important that I.S. undergo the procedure to close the PDA. She said she has discussed with Mother the agency's concerns about I.S., which include the fact that I.S. has Down syndrome and "other medical complex issues" and there is a concern about I.S.'s growth. She said she told Mother that closure of the PDA is what the doctors recommend and is "something that's minor that through the grand scope of everything that [I.S.] is gonna have to deal with, this is something that could lessen stress on his life."

{¶ 56} Under examination by I.S.'s guardian ad litem, Wagner testified that she had spoken with the Cleveland Clinic cardiologist about the cardiologist's recommendation for closure and the cardiologist told her that the recommendation was based on I.S. having Down syndrome as I.S. was "already going to have high risk for pulmonary issues or lung issues." She testified that the cardiologist continued as follows:

> And with this PDA already putting extra fluid and stress right here. His concern was given the time of COVID and just the example that we spoke of, he was very concerned that if this child gets, you know, I think he stated to me, God forbid, COVID or bronchitis even, that it would be much harder for him to get better because of this. And he is concerned as far as if you have the PDA — if you don't get the PDA closure when they're younger, the risk continues to be more and more as he gets

older. He did state to me that the — [I.S.] is a different kind of child for him, given the fact that he has [D]own syndrome and his PDA is not a small PDA. It's more on the small to moderate side. And then given all of his extra health issues, was his higher risk of concern.

{¶ 57} Wagner said she believed Mother understood what Wagner was discussing and Mother acknowledged that closure is the doctors' recommendation. Wagner testified that Mother nevertheless refused to allow I.S. to undergo the procedure because it was against her religious beliefs. Wagner said Mother did not comment on how the closure might affect I.S.'s health and, indeed, refused to talk with her about I.S.'s medical information. She said the agency tried to better understand Mother's religious objection by offering to speak with a religious person who could educate agency personnel on Mother's religion.

{¶ 58} Wagner said Mother obtained a second medical opinion from University Hospitals ("UH") about I.S.'s PDA and the second opinion also recommended closure. She said she spoke with I.S.'s cardiologist at University Hospitals about I.S. She said the cardiologist contacted her, told her that Mother had sought a second opinion from them, they offered to close the PDA and she declined, they scheduled I.S. for a follow-up appointment with a pediatrician and Mother missed that appointment.

{¶ 59} On examination by I.S.'s guardian ad litem, Wagner testified that the University Hospitals cardiologist did not express an opinion to her about whether the PDA was life threatening. She said the cardiologist emphasized that the cardiologist "had limited access to previous medical appointments and * * * she only

could get kind of like a quick snapshot of what was going on right there. And she was only seeing him for a second opinion. So she did not have time to go and really consult with everybody and get background charts from everything from his birth."

{¶ 60} Wagner said Mother never offered the agency any alternative treatment options that she found acceptable that might achieve the same goals as closure of the PDA.

{¶ 61} Wagner identified the University Hospitals pediatric cardiologist's written opinion about I.S., which the agency received from University Hospitals. The medical note lists a visit date of January 20, 2022. The note relates that the cardiologist saw I.S. for a second opinion regarding the Cleveland Clinic's recommendation that the PDA be closed.

{¶ 62} The cardiologist wrote that the Cleveland Clinic "had told the mother that [I.S.'s] growth was poor. * * * When we saw him, his growth was reasonable when plotted on the down syndrome growth curve[.] * * * I will note that [h]is growth is appropriate on our scale for this one point, but I don't have prior weights to know that he has not been losing weight."

{¶ 63} Regarding I.S.'s PDA, the cardiologist wrote as follows:

> I presented him [at] our joint case conference with our surgeons, cath team, and cardiologists this morning 1/26/2022. The consensus was he would be a reasonable candidate for PDA device closure given the left sided heart dilation. Additionally, this would also be protective for his lungs given his already elevated risk of pulmonary hypertension with trisomy 21. * * * I confirmed [to Mother] that we would recommend device closure.

{¶ 64} The cardiologist wrote that Mother "said she knew that we would recommend closure and she respects that but is not willing to do so at the time because it goes against her religion * * *."

{¶ 65} Wagner also identified what she described as discharge paperwork from University Hospitals regarding I.S. The document describes that University Hospitals examined I.S. and performed an echocardiogram on I.S. on January 20, 2022. The document contains several electronic medical notes from physicians at University Hospitals.

{¶ 66} Regarding the physical exam, the medical note indicates that I.S.'s lungs were "clear to auscultation bilaterally[;] [n]o crackles or rhonchi noted."

{¶ 67} Regarding the echocardiogram, the pediatric cardiologist wrote that I.S. has a "small PDA with continuous left to right shunting and associated left heart enlargement." She wrote that I.S. "is asymptomatic from a PDA perspective and growth is at approximately the [30th percentile] for both height and weight on the Down Syndrome growth curve from the CDC, which is appropriate." She wrote that I.S. "meets indication for PDA closure." Of her reasoning for recommending closure, she wrote as follows:

> In these cases, we typically recommend closure of the PDA to prevent risk of developing pulmonary hypertension. The risk of pulmonary hypertension is already higher in patients with trisomy 21 so this is even more important in [I.S.]'s case. * * * I discussed with the mother that closure of hemodynamically significant PDAs are particularly important to close in patients with trisomy 21 due to their already increased risk of developing pulmonary hypertension. The fact that [I.S.] has left heart enlargement supports the increased amount of blood going to his lungs which places him at risk for development of

pulmonary hypertension over time.  * * * He has no signs or symptoms of pulmonary hypertension on clinical exam.

* * *

[Mother] denies additional symptoms related to the cardiovascular system * * *.  [Mother] denies a history of difficulty or sweating with feeds.  He is walking and feeding himself, but mother notes that his growth is slow and he is only saying a few words.

{¶ 68} The cardiologist's note indicates that Mother asked appropriate questions regarding the risks involved in the catheterization procedure and was "aware that transcatheter closure is most commonly performed if anatomy amendable."

{¶ 69} On cross-examination, Wagner admitted that the cardiologist from University Hospitals had consulted with other physicians regarding I.S., but she did not know if Mother participated in any meeting among those physicians.

{¶ 70} Wagner testified that Mother has been very reluctant to talk to agency personnel about this medical information.  She said it is her understanding that Mother does not want a "piece that's not part of her child's body" put into I.S. and also objects to the other surgery option.

{¶ 71} Wagner said she consulted with the Cleveland Clinic about potential appointment availability if Mother became agreeable to the surgery.  The Cleveland Clinic staff told her that I.S. would need to be seen for a follow-up appointment because the cardiologist had not seen I.S. in some time, then I.S. would need to receive a new echocardiogram; if I.S. were to be closed through catheterization, the

cardiologist would perform the procedure and had availability over the next two months.

{¶ 72} Wagner said I.S. has had no primary-care physician for the last year and missed his two-year checkup. She said the agency had counseled Mother about the importance of getting I.S. a pediatrician. On cross-examination, she said the agency offered her some recommended physicians but Mother was not interested in receiving those names and reported that she knew where to find a pediatrician.

{¶ 73} Wagner testified that when the complaint was filed in January 2022, no progress had been made in addressing any of the agency's medical concerns about I.S. She said that in the course of this litigation, Mother had been instructed to get lab work done for I.S. by an endocrinologist, to get an ultrasound for I.S.'s bladder, and to get a sleep study for I.S. On examination by I.S.'s guardian ad litem, Wagner testified that Mother was instructed to get this lab work done because I.S. has hypothyroidism. Wagner said she did not know if the hypothyroidism was life threatening.

{¶ 74} Wagner said that Mother got the endocrinology lab work done but had not followed up with an endocrinologist regarding the results. Wagner said Mother did complete the bladder ultrasound. Wagner said that Mother took I.S. for the sleep study on March 6, 2022, but the test could not be completed because I.S. was congested. She said Mother had taken no steps to reschedule that study, to her knowledge.

{¶ 75} On cross-examination, Wagner admitted that she does not have a medical background; she is a social service worker for the agency. She said it remains the agency's opinion that I.S.'s medical condition is life threatening. She admitted that she was not aware whether physicians ever discussed with Mother whether "holding off" on surgery in favor of continued monitoring was an option.

{¶ 76} The agency offered the two exhibits from University Hospitals into evidence, without objection from Mother.

### 2. Mother's Case

{¶ 77} Mother testified at the dispositional hearing.

{¶ 78} Mother testified that a number of appointments were scheduled for I.S. after his birth because I.S. has Down syndrome. Mother said she took I.S. to pediatricians for wellness visits; she first went to a male doctor and then the hospital switched her appointments to be with Dr. Eva Kubiczek-Love.

{¶ 79} Mother said I.S. was also scheduled for an echocardiogram and a consultation with a cardiologist. Mother said that the cardiologist informed Mother about I.S.'s PDA after his echocardiogram. She said the cardiologist recommended that "we can wait for a little while" but I.S. should come back in after about six months so the doctor could determine if the PDA was still open. Mother said the cardiologist also told her "something about closing it" during this visit. Mother said I.S. did not immediately go back to the cardiologist after six months because of the COVID-19 pandemic.

{¶ 80} Mother testified that I.S. saw Dr. Kibuczek-Love one day before CCDCFS came to her house. She said that at that time, she had an appointment with the cardiologist and she did ultimately take I.S. to see the cardiologist again, maybe in October 2021. Mother testified that the cardiologist discussed the risks and benefits of medically intervening to close the PDA. Mother said the cardiologist told her that the risks of the procedure included that the anesthesia could kill I.S., that I.S. could "die on the table" during the procedure and that the catheter may not be compatible with I.S.'s heart. Mother said that she understood from this conversation that she would have to worry for the rest of I.S.'s life about the catheter negatively affecting I.S.'s heart or "fall[ing] to different organs" and causing "sudden death." Regarding the procedure's benefits, Mother testified that the cardiologist told her that I.S.'s lungs "are great right now, but they can get worse." She said the cardiologist told her he wanted to do the procedure.

{¶ 81} Mother testified that she did some of her own research on PDAs and came to the understanding that small to moderately sized PDAs do not have to be closed. She said she further came to the understanding that the "effects" of a PDA included being fatigued, not eating and not growing; she testified that I.S. did not exhibit any of those "side effects." She said that, to the contrary, I.S. is "like a normal child;" he eats well, walks, knows sign language and is learning to speak words. She said that she is a mother of six children and knows "when my child is in distress and [when] he's not." On cross-examination, she continued as follows:

Right now [I.S.] is an energetic little child that you cannot even tell that he has [D]own syndrome. He's walking around, he's talking. He's very energetic. They act like he should be laid over and he should be in distress and he should be exhausted.

He's none of them things. He's climbing. He's walking. He has a whole playroom in my living room where he's climbing on the slide and sliding down. He's climbing — I have to get him off of stuff where he's trying to climb on the table. He's very energetic, and I do not want them to change that.

{¶ 82} Mother said she also took I.S. for a second opinion from doctors at University Hospitals. Mother testified that she understood that UH determined that I.S. is "growing great."

{¶ 83} Mother also said that she took I.S. for thyroid testing and lab work and it was her understanding that those tests did not reveal any concerns.

{¶ 84} Mother testified that she considered all the information she had been provided and that she found through her own research and decided against the PDA procedure.

{¶ 85} Of her reasoning for refusing the procedure for I.S., she testified that she is a "true follower of the most Honorable Elijah Muhammad" and had made an oath to him that she would follow his "d[i]vine instructions from almighty god Allah." She described that she believes that Elijah Muhammad teaches the truth about the world, is her "lord and saviour," and will return one day. She related that these teachings include an instruction not to "put any foreign objects in your body" and to be careful relying on doctors for a number of reasons. She described that these teachings are skeptical of drugs and instead emphasize learning "how to eat to live." On cross-examination, Mother explained her definition of a "foreign object"

as something that is not "made of your body," like the catheter that would be used to close I.S.'s PDA. She said she is not opposed to some kinds of medical treatments, but she described her understanding that followers of her religion are not supposed to have surgeries or receive blood transfusions or vaccinations.

{¶ 86} Mother said that she is not a neglectful mother and loves I.S. "I am his protector," she said, "[a]nd almighty god is the only one that can protect him." On cross-examination, Mother testified that she believed that doctors cannot cure I.S. and that the instrument the doctors wanted to put in I.S.'s heart "not only is not going to cure him, it could lead to more."

{¶ 87} Mother said that if the surgery is not completed now, she plans to monitor I.S. for as long as is necessary, "because I love him." She said she would take him to a hospital if he ever came to be in distress. On cross-examination, Mother admitted that she would never consent to the surgery because "I cannot go against my god. * * * I will not go against the most Honorable Elijah Muhammad."

### 3. I.S.'s Guardian Ad Litem's Report and Recommendation

{¶ 88} I.S.'s guardian ad litem ("GAL") filed a written report and participated at the dispositional hearing.

{¶ 89} In the GAL's written report, he related that he had completed a home visit at Mother's home in January 2022 and found it to be "safe, clean, and appropriate." He reported that Mother seemed like a "knowledgeable, determined, and informed parent" with "deep and sincere" religious beliefs. He noted that Mother "demonstrated detailed knowledge of [I.S.'s] medical history, his diagnoses,

and the recommended course of treatment." He wrote that Mother expressed a belief that I.S.'s lungs are "great" and his muscle tone is "fine." The GAL also noted that I.S.'s muscle tone appeared to be okay. The GAL reported that he found I.S. to be a "happy, well-adjusted child" who was developmentally adjusted considering his age and Trisomy 21 diagnosis. The GAL noted that two of Mother's other children were present during the home visit and appeared to have a "strong bond" with I.S. He wrote that I.S. appeared to be appropriately bonded to Mother and his siblings, too.

{¶ 90} The GAL agreed with the agency that it was not necessary to remove I.S. from Mother's home, but he nevertheless recommended that the juvenile court grant protective supervision over I.S. to the agency and order that I.S. undergo surgery to correct I.S.'s congenital PDA. The GAL noted his opinion that "the medical evidence is overwhelming" that surgery to repair I.S.'s PDA was in I.S.'s best interest. He wrote that the agency "further indicated that open heart surgery was not necessary, as doctors have offered Mother a 'less invasive' option of conducting the procedure via a catheter in [I.S.]'s groin." He wrote that his own investigation "further revealed that the procedure can be done on a relatively non-invasive manner and will not involve open heart surgery." He also reported that Mother had not followed up with an endocrinologist regarding I.S.

{¶ 91} At the hearing, the GAL testified that Mother is a suitable parent who has raised several children before I.S. and is "well versed" in I.S.'s medical conditions. According to the GAL, I.S. is "doing extremely well, even in light of all

the conditions, congenital conditions that he's been born with." He said that I.S. is walking around Mother's home and that he has seen I.S. throwing a basketball at a basketball hoop.

{¶ 92} The GAL reported that he saw this as "purely a medical case, medical issue." He said he appreciated that Mother went "to the difficulty of getting a second medical opinion" about the PDA and he acknowledged that there "is some daylight" between Dr. Love's opinion and the second opinion from University Hospitals. He said Dr. Love was adamant that the PDA presented an immediately life-threatening condition, whereas the UH report and electrocardiogram summary — at least from his review — do not indicate that the PDA is immediately life-threatening. But, he said, the UH cardiologist ultimately concluded that I.S. met the indication for closure of the PDA.

{¶ 93} The GAL testified that I.S. was too young to voice any position on surgery and he believed it was in I.S.'s best interest to (1) remain in Mother's custody, (2) have court-ordered protective supervision granted to the agency and (3) have either of the two PDA-closure procedures ordered. He testified that his recommendation was based solely on the fact that both the physician at the Cleveland Clinic and the second opinion from UH recommended that I.S. undergo a procedure to close the PDA. He said that Mother's religious beliefs are sincere and deeply held but that I.S.'s medical needs and best interest take precedent.

### 4. Closing Argument

{¶ 94} The parties' counsel then gave closing arguments.[5]   During closing argument, Mother's counsel said the following:

> * * * [Mother] also testified that she would continue to monitor this situation regarding the child's PDA and then take action if and when something was necessary.   I would ask the Court for protective supervision and to allow the mother — not to order the surgery, just protective supervision to make sure that the child is monitored and that — to assist mom with any decisions in the future.

### D. The Court's Grant of Protective Supervision and Mother's Appeal

{¶ 95} On April 12, 2022, the magistrate issued a decision granting protective supervision of I.S. to the agency and finding as follows:

> Pursuant to ORC §2151.42, the Court finds, based on the facts that have arisen since the last order of Court was issued or based on facts that were unknown to the Court at the time, that a change has occurred in the circumstances of the child or the child's legal custodian, and that modification or termination of the order is necessary to serve the best interests of the child.

{¶ 96} The magistrate further ordered as follows:[6]

---

[5] The juvenile court addressed, at the close of the dispositional hearing, the fact that the agency had not yet filed a case plan relating to the prospective surgery.  Mother objected to timeliness of the case plan and the juvenile court overruled that objection.  Mother does not assign error from that decision.

[6] The juvenile court also ordered that (1) Mother obtain a primary-care physician for I.S., provide the agency with contact information and a release of information and schedule a well visit for I.S. and (2) reschedule I.S.'s sleep study and comply with all the follow-through appointments or recommendations for this study as well as with certain endocrinology appointments.  Mother's appellate arguments are focused solely on the PDA surgery, and during the dispositional hearing, she did not express any religious objection to these other orders the agency sought.  On appeal, Mother does not challenge these other aspects of the juvenile court's order, except in that she argues that I.S. was not properly adjudicated a neglected child.  Therefore, we will only consider whether the

The case plan is approved.

\* \* \*

Mother is to schedule the child's Patent Ductus Arterios[u]s ("PDA") closure within fifteen (15) days of journalization, with such preliminary appointments and final procedure to occur within sixty (60) days of journalization of the dispositional entry.

\* \* \*

Mother is to cooperate fully to complete [the] Patent Ductus Arterios[u]s ("PDA") procedure within sixty (60) days of journalization of the dispositional entry and timely comply with any/all recommended post-procedure appointments and follow-up.

{¶ 97} Mother filed timely objections to the magistrate's decision. The juvenile court overruled Mother's objections and affirmed, approved and adopted the magistrate's decision and findings.

{¶ 98} Mother appealed, raising the following sole assignment of error for review:

The juvenile court erred when it awarded CCDCFS protective supervision and required Mother to order medical procedures for her Child that are contrary to Mother's religious beliefs.

## II.   Law and Analysis

{¶ 99} Mother challenges both the juvenile court's adjudication of I.S. as a neglected child and also the juvenile court's disposition — placing I.S. under protective supervision and ordering that I.S. undergo a surgery that Mother does not want for him.  Mother contends that the juvenile court infringed on Mother's rights

_____

juvenile court erred in adjudicating I.S. a neglected child, placing I.S. in protective supervision or ordering Mother to schedule I.S. for surgery to close his PDA.

to practice her religious faith and raise her own child. The agency's case left much to be desired, especially considering the invasiveness of the treatment options the agency proposed. But employing the appropriate standards of review, we disagree with Mother. The adjudication of neglect was supported by sufficient evidence and ordering a catheterization closure of the PDA was not an abuse of discretion.

{¶ 100} We find that the trial court's order was unduly broad and contained arbitrary and irrational limits that are not supported by the evidence presented and we, therefore, narrow and limit the trial court's order accordingly.

{¶ 101} Before addressing the trial court's specific adjudication and order, we address Mother's argument that I.S.'s medical condition was not serious enough to allow the state to constitutionally intervene.

**A. The State's Power to Order Medical Interventions for Children**

{¶ 102} The parties seem to agree that Mother has constitutional rights to freedom of religion[7] and to direct the upbringing of her child.[8] The parties also seem

---

[7] We affirm that Mother has this right. "The First Amendment to the United States Constitution and Section 7, Article I of the Ohio Constitution safeguard an individual's freedom to both choose and employ religious beliefs and practices." *In re Milton*, 29 Ohio St.3d 20, 20, 505 N.E.2d 255, syllabus, *modified in part on other grounds, Steele v. Hamilton Cty. Community Mental Health Bd.*, 90 Ohio St.3d 176, 185–186, 736 N.E.2d 10.

[8] We affirm that Mother has this right also. Like religious freedom, the right to raise one's own child is "'an essential and basic civil right.'" *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 67, quoting *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997); *see also In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990) (a parent has a "'fundamental liberty interest' in the care, custody, and management" of their child), quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).

> [The right to raise one's own child] includes the right "to direct the upbringing and education" of one's child, *see Pierce v. Soc. of Sisters*, 268 U.S. 510, 534–535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), the right to

to agree that these rights are not absolute and that the state can intervene and order medical procedures for a child against their parents' wishes under certain circumstances. *See, e.g.*, *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944) ("[N]either rights of religion nor rights of parenthood are beyond limitation.").

{¶ 103} Mother does not challenge that the juvenile court has the statutory authority to order protective supervision and surgery when those circumstances — whatever they are — are met. The state "has broad authority to intervene to protect children from * * * neglect." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 28, citing R.C. 2151.01. Ohio's neglect statute, R.C. 2151.03, provides that a child whose parents refuse to provide proper or necessary medical or surgical care or treatment is a "neglected child." R.C. 2151.03(A)(3). A child who, because of the omission of their parents, suffers physical injury that harms or threatens to harm the child's health or welfare is also a "neglected child" under the statute. R.C. 2151.03(A)(6).[9] Once a child has been adjudicated as a neglected child, R.C.

---

communicate to the child a parent's moral and religious values, *see Pater v. Pater*, 63 Ohio St.3d 393, 397, 588 N.E.2d 794 (1992), to direct their "religious upbringing," *see Wisconsin v. Yoder*, 406 U.S. 205, 213–214, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), to select, within reason, whether and what type of medical care the child will receive, *see In re Willmann*, 24 Ohio App.3d 191, 493 N.E.2d 1380 (1st Dist.1986), and to determine where and with whom the child will reside.

*In re E.N.*, 1st Dist. Hamilton No. C-170272, 2018-Ohio-3919, ¶ 18.

[9] The neglect statute does not subject parents to criminal liability for failing to provide adequate medical or surgical care or treatment solely in the practice of religious beliefs, but the statute makes clear that this fact "does not preclude any exercise of the authority of the state * * * or any court to ensure that medical or surgical care or treatment

2151.353(A)(1) authorizes a juvenile court to place the child under protective supervision.[10]  If a juvenile court issues an order for protective supervision, the juvenile court is permitted to "place any reasonable restrictions upon the child, the child's parents, guardian, or custodian, or any other person * * *."  R.C. 2151.353(D).[11]

---

is provided to a child when the child's health requires the provision of medical or surgical care or treatment."  R.C. 2151.03(B).

[10] Prior to adjudication, a juvenile court is empowered to order emergency medical or surgical treatment "as appears to be immediately necessary for any child concerning whom a complaint has been filed," upon the certification of one or more reputable practicing physicians.  Juv.R. 13(C); R.C. 2151.33. Separate and apart from the abused–dependent–neglected framework, under certain circumstances a juvenile court may also appoint a guardian over a minor for purposes of making medical decisions for them.  R.C. 2111.02, 2111.06; *see also In re Guardianship of S.H.*, 9th Dist. Medina No. 13CA0066-M, 2013-Ohio-4380.

[11] Mother does not contend that the juvenile court's order requiring her to take affirmative steps to schedule and cooperate with the PDA-closure procedure — as opposed to an order restricting her from taking certain actions — was not permitted under R.C. 2151.353(D).  To the contrary, Mother's testimony seems to indicate her agreement to obtain the closure for I.S. if the court were to order it through protective supervision:

> AGENCY COUNSEL:  * * * Is there ever a point in his life where his situation — where you would consent to the surgery?
>
> MOTHER:  I'm not gonna consent to it, but I will respect the Judge's decision.
> * * *
> AGENCY COUNSEL:  So what you're saying is, you will never consent, but if the Court orders it.
>
> MOTHER:  I will have to.
>
> AGENCY COUNSEL:  Okay.
>
> MOTHER:  I'm in this world right now.

Therefore, we need not decide on this appeal whether an order requiring a parent to obtain a medical procedure for their child is a "reasonable restriction" permitted by the protective-supervision statute or is otherwise permitted.

{¶ 104} The parties further agree that the state can constitutionally intervene in circumstances where a child is facing an immediately life-threatening condition, as do we. "[I]t is well established in Ohio and in other jurisdictions, that, when parents cannot or will not consent to potentially life-saving treatment for a minor, then a court may appoint another to approve the procedure and thereby protect the child's life and health." *In re Guardianship of S.H.*, 9th Dist. Medina No. 13CA0066-M, 2013-Ohio-4380, ¶ 25; *see also State v. Perricone*, 37 N.J. 463, 474, 181 A.2d 751 (1962) (the state could act under its *parens patriae* authority to protect a child's welfare by declaring the child neglected to obtain necessary medical treatment when it was two or three times more likely that the child would die that very night without a blood transfusion and was at imminent risk of severe irreversible brain injury).

{¶ 105} This is true even where the parents' refusal to consent to needed medical treatment for their child is based on earnestly held religious beliefs. "[I]n matters of medical treatment, the religious faith and beliefs of parents whose child requires medical attention do not permit the parents to expose the child to progressive ill health and potential death * * *." *In re J.J.*, 64 Ohio App.3d 806, 809, 582 N.E.2d 1138 (12th Dist.1990), citing *In re Willmann*, 24 Ohio App.3d 191, 493 N.E.2d 1380 (1st Dist.1986); *see also Prince*, 321 U.S. at 166–167, 64 S.Ct. 438, 88 L.Ed. 645 ("The right to practice religion freely does not include liberty to expose * * * the child to * * * ill health or death.").

{¶ 106} Thus, Ohio courts have ordered medical interventions like chemotherapy and surgery over parents' objections when a minor's condition is immediately life-threatening. *See In re Guardianship of S.H*; *In re Willmann* at 193.

{¶ 107} The disagreement in this case concerns when the state can constitutionally intervene to address medical conditions that are not immediately life threatening. Mother argues in her briefs that the state could not intervene here because I.S.'s PDA was not "currently life-threatening." The agency argues that it was appropriate for the juvenile court to intervene because I.S. has "significant medical needs" and Mother failed "to take appropriate steps to meet those needs."

{¶ 108} Ohio courts have approved adjudications of dependency, protective supervision and other court-ordered dispositions in situations where a child's medical condition is serious but not immediately life-threatening.

{¶ 109} For instance, a court ordered a blood transfusion for a child over the religious objections of the parents because, even though the child was not "at death's door," his blood condition had been steadily deteriorating and a transfusion could at any moment become emergently needed to keep the child alive. *In re Clark*, 90 Ohio Law Abs. 21, 185 N.E.2d 128 (C.P.1962) ("[W]hether or not the situation was emergent at the time [the movant] sought the court authorization, nevertheless it was pregnant with emergency in that the need for blood might become imperative at any moment * * *.").

{¶ 110} Moving further away from death's door, a juvenile court adjudicated a minor as dependent and ordered continued protective supervision related to

concerns about a parent's mental health, despite finding that the child's health problems — including apparent cerebral palsy and failure to thrive requiring hospitalization — were not immediately life-threatening. *In re Stewart*, 11th Dist. Portage No. 96-P-0016, 1996 Ohio App. LEXIS 4893, 18–20 (Nov. 8, 1996). The court of appeals affirmed, reasoning that, while the child's medical condition was improving, "there was more improvement to be accomplished" and the child's parent had resisted and refused some medical treatment for the child. *Id.* at 19. A juvenile court also ordered a teenager to receive treatment for gonorrhea against the minor's wishes that were based on his religion. *In re J.J.* 64 Ohio App.3d 806, 582 N.E.2d 1138.

{¶ 111} Moving further away still, a juvenile court awarded sole medical-decision-making authority to one parent where the child had sinus problems and possible sleep apnea and the other parent had canceled some medical appointments that had been recommended by the child's physicians. *Ward v. Ward*, 11th Dist. Lake No. 97-L-165, 1998 Ohio App. LEXIS 2934.

{¶ 112} These cases, as well as a body of cases from courts outside of our state, make clear that courts, under certain circumstances, have the power to intervene to order medical interventions — without running afoul of constitutional rights to religious freedom and parenting — when the child's medical condition is substantial but not immediately life-threatening. *See* ¶ 106, 109–111 above; *see also, e.g., State v. Rogers (In re D.R.)*, 2001 OK CIV APP 21, 20 P.3d 166 (Okla. Civ. App.) ("It is also well settled that the state may order medical treatment for a non-life

threatening condition, notwithstanding the objection of the parents on religious grounds, if the treatment will, in all likelihood, temporarily or permanently solve a substantial medical problem."); *In re Eric B.*, 189 Cal.App.3d 996, 235 Cal.Rptr. 22 (Cal. Ct. App.1987) (ordering periodic medical monitoring to detect the possible recurrence of a life-threatening disease, eye cancer, where there was no present showing of cancer in the child but where there was a high probability that the cancer would return); *In re Jensen*, 54 Or.App. 1, 633 P.2d 1302 (Or. Ct. App.1981) (ordering a surgery to correct a physical deformity, notwithstanding parental objection and a lack of immediate medical necessity); *In re Karwath*, 199 N.W.2d 147 (Iowa 1972) (upholding order to remove children's adenoids and tonsils even in the absence of "medical crisis demonstrating an immediate threat to life and limb").

{¶ 113} Because of the complexity of medicine and the number of variables that can be expected to change from case to case, it may be impossible to draw a clear line between medical conditions serious enough to permit the state's intervention and those that do not. We are persuaded that the correct approach is for a court to consider the unique facts and circumstances of the case before it, balancing the parents' fundamental interest in directing the upbringing of the child with the state's interests. *See In re Guardianship of S.H.*, 9th Dist. Medina No. 13CA0066-M, 2013-Ohio-4380, at ¶ 22 ("When the state seeks to regulate parental decision making against the wishes of the parents, the competing interests 'must be determined by balancing [the] liberty interests [of the parents and child] against the

relevant state interest.'"), quoting *Cruzan v. Director, Mo. Dept. of Health*, 497 U.S. 261, 279, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990).

{¶ 114} This balancing test should include a consideration of all relevant factors, including but not limited to the following: (1) the nature and seriousness of the child's medical condition, (2) the effectiveness of the proposed intervention, (3) the invasiveness of the intervention and the risks to the child if the intervention is ordered and (4) the risks to the community if the intervention is not administered.[12]  *See Newmark v. Williams/DCPS*, 588 A.2d 1108, 1115–1118 (Del.1991) (describing balancing test and collecting cases); *M.N. v. Southern Baptist Hosp.*, 648 So.2d 769, 771 (Fla.App.1994) ("[C]ourts must carefully consider the facts and circumstances of each individual case as it arises, in weighing the various competing interests. * * * This necessitates consideration of the [parents'] interest in making fundamental decisions regarding the care of their minor child, the state's interest in preserving human life, and the child's own welfare and best interests, in light of the severity of the child's illness, the likelihood as to whether the proposed treatment will be effective, the child's chances of survival with and without such treatment, and the invasiveness and nature of the treatment with regard to its effect on the child."); *In re Phillip B.*, 92 Cal.App.3d 796, 802, 156 Cal.Rptr. 48 (1979)

---

[12] In addition to these factors, courts have considered a child's family's financial situation and the cost of medical treatment in deciding whether to intervene to assure that a child receives treatment. *See In re Guardianship of S.H.* at ¶ 31. Neither Mother nor the agency presented evidence or argument related to Mother's financial situation or the cost of the catheterization procedure, leading us to conclude that Mother's objection is not based on financial burden.

("The state should examine the seriousness of the harm the child is suffering or the substantial likelihood that he will suffer serious harm; the evaluation for the treatment by the medical profession; the risks involved in medically treating the child; and the expressed preferences of the child."); *In re J.J.* 64 Ohio App.3d 806, 582 N.E.2d 1138 (noting that the state also has a legitimate interest in preventing the spread of a contagious and potentially deadly disease and that "the right to freely practice religion does not include liberty to expose the community to communicable disease * * *.").

{¶ 115} Having set forth the framework in which we will consider the evidence the agency presented here, we set forth the standard of review and apply the balancing test to I.S.'s PDA.

**B. The Standard of Review**

{¶ 116} A juvenile court's adjudication of a child as neglected must be based on clear and convincing evidence. *See* R.C. 2151.35(A)(1). "Clear and convincing evidence" is that "measure of or degree of proof" that "produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *In re M.S.*, 8th Dist. Cuyahoga Nos. 101693 and 101694, 2015-Ohio-1028, at ¶ 8. "It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." (Emphasis deleted.) *Cross* at 477.

**{¶ 117}** "Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Id.*; *see also In re S.B.*, 8th Dist. Cuyahoga Nos. 110016 and 110017, 2021-Ohio-1091, ¶ 22 ("In determining whether a juvenile court based its decision on clear and convincing evidence, a reviewing court will examine the record to determine whether the trier of fact had sufficient evidence before it to satisfy the degree of proof.").

**{¶ 118}** Once a child has been adjudicated neglected, a juvenile court may place the child in protective supervision if it finds by a preponderance of the evidence that protective supervision is in the child's best interest. *See In re J.D.*, 5th Dist. Richland No. 12-CA-107, 2013-Ohio-2186, ¶ 29–30. We review the juvenile court's dispositional order placing I.S. in protective supervision for an abuse of discretion. *See id.* at ¶ 31; *In re Daum*, 3d Dist. Auglaize No. 2-94-28, 1995 Ohio App. LEXIS 1516, 3–7 (Mar. 31, 1995); *In re Day*, 12th Dist. Clermont No. CA2002-09-073, 2003-Ohio-3544, ¶ 22. A court abuses its discretion when it exercises its judgment in an unwarranted way. *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35. An abuse of discretion implies that the court's attitude is unreasonable, arbitrary or unconscionable. *See, e.g., State v. Musleh*, 8th Dist. Cuyahoga No. 105305, 2017-Ohio-8166, ¶ 36, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

## C. Clear and Convincing Evidence Supported the Juvenile Court's Adjudication of Neglect

{¶ 119} The evidence in the record is that I.S.'s PDA is not immediately life-threatening. I.S. had lived with this condition for over two years at the time of these hearings. As of January 2022, University Hospitals' pediatric cardiologist noted that I.S. was "asymptomatic" as it relates to his PDA and, while we note that in context it seems that a significant basis for that conclusion was based on Mother's denial of symptomology, the information Mother provided to the cardiologist is partly corroborated by I.S.'s GAL and an agency social worker both of whom testified that during home visits, I.S. seemed perfectly normal for his age and considering his diagnosis of Down syndrome. The pediatric cardiologist also noted in a medical record that as of January, I.S. had no signs or symptoms of pulmonary hypertension.

{¶ 120} While not immediately life threatening, there was sufficient evidence for the juvenile court to develop the firm belief or conviction that I.S.'s medical condition was serious enough to warrant state intervention because Mother was not taking the appropriate steps to address the condition.

{¶ 121} I.S.'s pediatrician documented that I.S. has Down syndrome and had experienced "profound weight loss/decline" and "significant failure to thrive." She documented her opinion that I.S. would not "have the ability to combat the myriad of medical issues that are currently being left untreated." She noted a number of medical concerns that Mother was not adequately addressing, including the PDA. She identified that I.S. has a "moderate sized PDA" and that the Cleveland Clinic cardiology team opined that leaving the condition unrepaired "may result in both

ongoing inability to thrive (again as evidenced by his growth chart) but may also result in death." She said that she is certain that at some point in I.S.'s life the PDA would have to be addressed. She said her particular concern regarding I.S. was that if the PDA was contributing to the failure to thrive, it should be closed "sooner rather than later."

{¶ 122} Dr. Kubiczek-Love testified that the PDA would put extra work on I.S.'s lungs and that I.S.'s upper-airway issues were also leading to "more back pressure" on I.S.'s lungs. She described that this added work requires more calories, which may have been why I.S. was not growing sufficiently. "And if you can't grow, if you can't gain weight, you cannot — your body cannot handle these things," she said; "[t]hey just simply eventually will give up."

{¶ 123} While Dr. Kubiczek-Love is not a cardiologist, she is a medical doctor and testified that she consulted with the cardiology and otolaryngology teams about I.S. and "there was an unequivocal agreement from his medical care team that this was of grave concern." We note that Dr. Kubiczek-Love had not seen I.S. for nearly a year at the time of the hearing.

{¶ 124} Both Dr. Kubiczek-Love and the agency social worker testified that Mother had not followed up with medical specialists to monitor and address I.S.'s significant failure to thrive and the pediatrician's primary concerns, which extended beyond the PDA.

{¶ 125} We find that this evidence was sufficient to allow the juvenile court to conclude that Mother had refused to provide proper or necessary medical or surgical care or treatment for I.S. and that I.S. was a neglected child.

### D. The Juvenile Court Did Not Abuse its Discretion by Ordering the Catheterization Closure of I.S.'s Patent Ductus Arteriosus if I.S. is a Candidate for the Procedure, but its Order was Unduly Broad and Contained Arbitrary and Irrational Limits that are Not Supported by the Evidence Presented

{¶ 126} As we set forth above, in reviewing the juvenile court's dispositional order for an abuse of discretion we balance Mother's interest in directing the upbringing of I.S. with the state's interest in protecting the health and wellbeing of I.S. In doing so, we consider all relevant factors, including but not limited to the following: (1) the nature and seriousness of the child's medical condition, (2) the effectiveness of the proposed intervention, (3) the invasiveness of the intervention and the risks to the child if the intervention is ordered and (4) the risks to the community if the intervention is not administered

### 1. Mother's Fundamental Interest

{¶ 127} Mother's side of the scale starts with a heavy weight on it, representing her fundamental interest in directing the upbringing of her child and the presumption that a parent acts in their child's best interest.

> The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions. More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children.

*Parham v. J.R.*, 442 U.S. 584, 602–603, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979).

## 2. The Seriousness of I.S.'s Medical Condition

{¶ 128} The more serious the medical condition for the child, the heavier the weight that will be placed on the state's side of the scale.

{¶ 129} I.S.'s pediatrician documented that I.S. has Down syndrome and had experienced "profound weight loss/decline" and "significant failure to thrive." She documented her opinion that I.S. would not "have the ability to combat the myriad of medical issues that are currently being left untreated." While University Hospitals identified I.S.'s weight as "appropriate," their cardiologist specifically noted that she did not have access to I.S.'s previous recorded weights and would not know if I.S. had lost weight.

{¶ 130} Dr. Kubiczek-Love identified that I.S. has a "moderate sized PDA" and that the Cleveland Clinic cardiology team opined that leaving the condition unrepaired "may result in both ongoing inability to thrive (again as evidenced by his growth chart) but may also result in death." She said that she is certain that at some point in I.S.'s life, the PDA would have to be addressed. She testified that the PDA would put extra work on I.S.'s lungs. She said that I.S.'s upper-airway issues were also leading to "more back pressure" on I.S.'s lungs. She described that this added work requires more calories, which may have been why I.S. was not growing sufficiently.

{¶ 131} While Dr. Kubiczek-Love is not a cardiologist, she is a medical doctor and she testified that she consulted with the cardiology and otolaryngology teams

about I.S. and "there was an unequivocal agreement from his medical care team that this was of grave concern."

{¶ 132} An agency social worker testified that she also spoke with the Cleveland Clinic cardiologist, who expressed a concern that I.S.'s PDA was "already putting extra fluid and stress" on I.S.'s organs. The cardiologist told her that respiratory illnesses like COVID or bronchitis would be much harder on I.S. because of the PDA.

{¶ 133} The pediatric cardiologist at University Hospitals similarly identified that, while closure of PDAs is normally the recommendation, it was "particularly important" to close I.S.'s PDA because patients with Trisomy 21 are at higher risk of pulmonary hypertension and I.S.'s heart is already enlarged. The pediatric cardiologist presented I.S.'s case to a team of surgeons, catheterization specialists and cardiologists, and the consensus was that I.S. was a candidate for catheterization closure of the PDA. That pediatric cardiologist identified the issue as a "small PDA."

{¶ 134} It is undisputed that the medical teams who considered I.S.'s case at both the Cleveland Clinic and University Hospitals recommended closure of I.S.'s PDA, noted that it was currently putting more stress on I.S.'s lungs and left I.S. at higher risk of chronic lung disease. The record supports the conclusion that, in the short term, the PDA would continue to put additional stress on I.S.'s lungs, requiring more calories and making it harder for I.S. to recover from common respiratory

illnesses. Over the long term, the risk for adverse health consequences and chronic lung disease will only increase.

### 3. The Effectiveness, Invasiveness and Risks of the Proposed Intervention

{¶ 135} The more effective the intervention, the heavier the weight that will be placed on the state's side of the scale; the more invasive the procedure and the more risks posed by the intervention, the lighter the weight placed on the state's side of the scale. As the Supreme Court of Delaware explained in a carefully considered opinion:

> The court must first consider the effectiveness of the treatment and determine the child's chances of survival with and without medical care. * * * The court must then consider the nature of the treatments and their effect on the child. * * * Federal and State courts have unhesitatingly authorized medical treatment over a parent's religious objection when the treatment is relatively innocuous in comparison to the dangers of withholding medical care. * * * The linchpin in all cases discussing the 'best interests of a child', when a parent refuses to authorize medical care, is an evaluation of the risk of the procedure compared to its potential success. * * * The State's interest in forcing a minor to undergo medical care diminishes as the risks of treatment increase and its benefits decrease.

*Newmark,* 588 A.2d at 1117; *see also Rogers (In re D.R.)*, 2001 OK CIV APP 21, 20 P.3d 166 ("[C]ourts have held that a state cannot order that a child receive medical treatment over religious objections of the parents when the treatment itself is very risky, extremely invasive, toxic with many side effects, and/or offers a low chance of success.").

{¶ 136} Thus, "[c]ourts have consistently authorized state intervention when parents object to only minimally intrusive treatment which poses little or no risk to a child's health." *Newmark* at 1120.

{¶ 137} The agency's case left much to be desired as it relates to these considerations.

{¶ 138} Dr. Kubiczek-Love could not describe the potential complications that may occur during a catheterization-closure procedure, let alone opine on how likely (or not) those complications are to arise. The agency did not elicit any testimony about the long-term risks of the catheterization, if any. Mother testified that she was told that the risks of the procedure included that the anesthesia could kill I.S., that I.S. could "die on the table" during the procedure and that the catheter may not be compatible with I.S.'s heart. She said that she understood that she would have to worry for the rest of I.S.'s life about the catheter negatively affecting I.S.'s heart or "fall[ing] to different organs" and causing "sudden death." Although this is lay testimony and Mother did not testify about how likely the cardiologist said these complications may be to occur, the agency did not offer any response to Mother's concerns, either.

{¶ 139} Dr. Kubiczek-Love was unable to state definitively how the surgeons would close I.S.'s PDA through open heart surgery. More concerning, the agency did not offer any evidence at all about the short or long-term risks posed by this extremely invasive surgery.

{¶ 140} The agency, in the future, should provide the juvenile court more evidence to allow it to fully consider the risks of the proposed interventions it seeks. That said, because we are reviewing only for an abuse of discretion and because the juvenile court need only have found that its disposition was in I.S.'s best interest by a preponderance of the evidence, we find that these considerations weigh in favor of ordering the catheterization-closure procedure.

{¶ 141} Dr. Kubiczek-Love testified that catheterization is not especially invasive, involving only the threading of a catheter through a small incision and placing a coil into the PDA to seal it. She testified that children with Trisomy 21 typically handle the procedure well and that medical staff would normally need to observe I.S. overnight. She testified that a medical team comprised of physicians from several different specialties at the Cleveland Clinic unequivocally agreed that I.S. should undergo the procedure, which necessarily implies that the physicians concluded that the benefits of the procedure outweigh the risks. The record reflects that the medical team that reviewed I.S.'s case at University Hospitals agreed.

{¶ 142} Dr. Love testified that the procedure would be completely effective because once the PDA is closed "it's fixed [and] it doesn't come back."

### 4. The Risk Posed to the Community by the Condition

{¶ 143} The more risk posed to the community from non-intervention, the heavier the weight placed on the state's side of the scale. *In re J.J.* 64 Ohio App.3d 806, 582 N.E.2d 1138 (noting that the state has a legitimate interest in preventing the spread of a contagious and potentially deadly disease and that "the right to freely

practice religion does not include liberty to expose the community to communicable disease"); *see also Yoder*, 406 U.S. 205, 233–234, 92 S.Ct. 1526, 32 L.Ed.2d 15 (state may act "if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens").

{¶ 144} Here, the agency offered no evidence that I.S.'s PDA will pose a risk to the community. Thus, we place no additional weight on the state's side of the scale based on risk to the community.

### 5. Balancing the Factors

{¶ 145} Under the unique circumstances and record of this case and after careful consideration, we find that it was not an abuse of discretion for the juvenile court to order closure of I.S.'s PDA through catheterization if I.S. remains a candidate for the procedure. Mother has a strong interest in making reasonable medical decisions for I.S. and the evidence reflects that she is a concerned mother who is very knowledgeable about I.S.'s medical conditions. But, in refusing to consent to the catheterization closure of I.S.'s PDA, Mother is subjecting I.S. to progressive ill health and significant risk when there is a minimally invasive intervention that would completely resolve the condition. Physicians from several specialties at two different hospital systems opined on the significant negative effects and risks of leaving I.S.'s PDA uncorrected and recommended catheterization closure. I.S.'s guardian ad litem also advocated for the procedure as being in I.S.'s best interest.

{¶ 146} The juvenile court did not abuse its discretion in ordering the procedure. We, therefore, affirm the juvenile court's dispositional order requiring Mother, within 15 days, to schedule and cooperate in preprocedure appointments to ensure that I.S. remains a candidate for closure of the PDA through catheterization and, if so, to schedule and cooperate in the closure procedure and any post-procedure appointments and follow-up recommended by the physicians involved in I.S.'s care.

{¶ 147} The juvenile court's order set forth a deadline for the procedure that is not reasonable in light of the evidence presented. The trial court ordered that I.S. undergo a procedure to close the PDA within 60 days, despite the fact that I.S. has not been seen by Dr. Kubiczek-Love for over a year, where Dr. Kubiczek-Love could not definitively say whether I.S. was even a candidate for catheterization closure at this time and where the cardiology team at the Cleveland Clinic reported that I.S. would have to undergo additional testing before undergoing the procedure. Setting a date certain by which I.S. must undergo the procedure was an abuse of discretion, especially when coupled with the juvenile court's allowance of open heart surgery as a closure option.[13]

{¶ 148} We vacate the juvenile court's requirement that the final closure procedure be completed within 60 days and remand with instructions to issue a new

---

[13] Under the juvenile court's order, if I.S. could not be scheduled for catheterization within 60 days but could be scheduled for open heart surgery by that deadline, the agency and I.S.'s care team would have been required to perform open heart surgery or seek a further order of the court.

journal entry requiring that the closure procedure occur at the earliest opportunity recommended by I.S.'s treating physicians if the preprocedure appointments confirm that I.S. is a candidate for closure through catheterization.

{¶ 149} We also conclude that the juvenile court's order is unreasonably broad in that it does not limit the PDA procedure to the minimally invasive catheterization but seemingly would allow for I.S. to undergo open heart surgery. Allowing open heart surgery, at this point and based on this evidence, was an abuse of discretion. The agency presented no evidence about the risks of this procedure or what I.S.'s recovery would entail. And there is a much less invasive alternative — catheterization — that seems to be readily available. We vacate the juvenile court's order to the extent that it allows for I.S.'s PDA closure to be accomplished through open heart surgery. If the precatheterization appointments reveal that I.S. is not a candidate for catheterization at this time, and if the agency still believes that open heart surgery is necessary, the agency can seek the intervention in the future. We would expect that a reasoned consideration of open heart surgery would include at least a consideration of why I.S. is not a candidate for catheterization at this time, an opinion from a cardiologist about the advisability of open heart surgery and the possibility of taking other steps to make I.S. a candidate for catheterization versus the risks of delaying the closure procedure.

{¶ 150} We, therefore, vacate the juvenile court's allowance of the closure procedure to occur through open heart surgery. Again, if I.S. is not a candidate for catheterization closure, the agency can seek this surgical intervention in the future.

## III. Conclusion

{¶ 151} We affirm the juvenile court's adjudication of I.S. as a neglected child.

{¶ 152} We affirm the juvenile court's placement of I.S. under protective supervision.

{¶ 153} We affirm the juvenile court's dispositional orders — unchallenged by Mother below or on appeal — requiring Mother to (1) obtain a primary-care physician for I.S., provide the agency with contact information and a release of information and schedule a well visit with the physician for I.S. and (2) reschedule I.S.'s sleep study and comply with all the follow-through appointments or recommendations for this study as well as with the ordered endocrinology appointments.

{¶ 154} We affirm the juvenile court's dispositional order requiring Mother to schedule, within 15 days, and cooperate in preprocedure appointments to ensure that I.S. is a candidate for closure of the PDA through catheterization and, if so, to schedule and cooperate in the closure procedure and any post-procedure appointments and follow-up recommended by the physicians involved in I.S.'s care.

{¶ 155} We vacate the juvenile court's requirement that the final closure procedure be completed within 60 days and remand with instructions to issue a new journal entry requiring that the closure procedure occur at the earliest opportunity recommended by I.S.'s treating physicians if the preprocedure appointments confirm that I.S. is a candidate for closure through catheterization.

{¶ 156} We vacate the juvenile court's allowance of the closure procedure to occur through open heart surgery.

It is ordered that the appellee recover from the appellant the costs herein taxed.

The court finds that there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the Cuyahoga County Court of Common Pleas, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

EILEEN A. GALLAGHER, PRESIDING JUDGE

MARY J. BOYLE, J., CONCURS;
EILEEN T. GALLAGHER, J., CONCURS IN PART AND DISSENTS IN PART (WITH SEPARATE OPINION)

EILEEN T. GALLAGHER, J., CONCURRING IN PART AND DISSENTING IN PART:

{¶ 157} I concur with the majority's conclusion that the juvenile court acted within its discretion to order closure of I.S.'s PDA through catheterization. And I agree that the 60-day deadline to complete the procedure was unreasonable given that Dr. Kubiczek-Love had not seen I.S. for over one year and there was no evidence as to whether I.S. was still a candidate for catheterization closure.

{¶ 158} I dissent, however, from the majority's decision to entirely vacate the juvenile court's judgment allowing closure of the PDA through open-heart surgery.

I am concerned that if catheterization is no longer a viable option by the time I.S. is again evaluated for it, and there is no order allowing for open-heart surgery, I.S.'s life may be in danger during the time it takes the agency to institute new proceedings to obtain a court order allowing the surgery. Instead, I would require that the juvenile court retain jurisdiction to weigh the parties' competing interests with respect to the open-heart surgery in the event that I.S.'s treating physicians conclude that the catheterization cannot be done. At that point, the juvenile court could quickly schedule a hearing and require the Agency to present medical evidence in the form of either expert testimony or an expert report, explaining the risks and benefits of open-heart surgery for I.S.

{¶ 159} I agree with the majority that the juvenile court abused its discretion in authorizing the open-heart surgery without sufficient expert medical evidence explaining the risks and benefits of the procedure for I.S. But I believe the safest approach would be to retain jurisdiction to make that decision in a timely manner based on expert evidence if the less invasive procedure is no longer an option.